# JAMES E. BRIGGS v. CHICAGO GREAT WESTERN RAILWAY COMPANY.[1]

March 6, 1953.

No. 35,743.

[1]Reported in 57 N. W. (2d) 572.

*Catherwood, Hughes & Alderson, Faegre & Benson, Paul J. Mc-Gough,* and *Wright W. Brooks,* for appellant.

*William A. Tautges* and *Eugene A. Rerat,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying defendant's motion for judgment notwithstanding the verdict or for a new trial.

The action arose under the provisions of 45 USCA, §§ 51 to 60, commonly known as the federal employers' liability act.

Plaintiff was 36 years of age at the time of the alleged injury and about 38 at the time of the trial. He had previously worked for defendant railway company as a section hand, but in December 1939 he commenced working for it as a locomotive fireman. He was employed in that capacity until June 20, 1948, when he claims to have been injured while working for defendant at Oelwein, Iowa, in which city he had lived for many years. After his alleged injury he continued to work for defendant somewhat intermittently as a fireman until August 13, 1948.

Plaintiff claims that at about 8:30 p. m. on June 20, 1948, he was employed as a fireman with a switching crew in defendant's yards and that, because of a broken rail on defendant's track, he was told by the engineer on the engine where he was working to take a crowbar, which he said the engineer handed to him, and pry a sand pipe on the engine back into position. He claims that the broken end of the rail had caught onto part of the sand pipe of the locomotive and it could not slide back. He testified that, while most of his body, except his left foot, was underneath the Diesel engine and while he was prying, the engineer released the air brake without warning. He said that, when he heard the air brake release, it indicated to him that the engineer was about to move the engine; that a cloud of dust blew into his face; that he became startled; and that in an attempt to get out from under the engine he struck the "left back side of my head and my neck, and up over my left

ear, and back of the temple" a "very severe blow" on the castings back of the frame of the locomotive. He said that after receiving the blow he was momentarily stunned; that his eyes were blurred and burning; and that he had a severe pain in the back of his head and neck. He testified that after he struck his head he got out from underneath the engine as soon as possible; that he "was very weak and upset" and was perspiring; that his neck, the back of his head, and his eyes were very painful; and that he was unable to see properly. He continued to work until quitting time that night (about 12 o'clock) and then rode home with the engineer with whom he was working.

The engineer, on the other hand, denied that any such incident as the broken rail had occurred and denied that he had ordered plaintiff to go under the locomotive as described. He said that he did not recall that plaintiff had been injured at any time while he was working with him as a fireman.

Defendant denies that plaintiff was injured as alleged or that there was a broken rail and claims that the first notice it had of any "accident" involving plaintiff was May 10, 1950, about 23 months afterward, when it was served with a summons and complaint in this action. It is defendant's position that plaintiff's case was one of uncontrolled diabetes, which finally resulted in diabetic retinitis and total blindness.

While there is a great deal of conflict in the medical conclusions of the contesting parties, it is plaintiff's general position and claim that his present condition of blindness was caused by the blow on the head referred to above, which brought about or caused an acute glaucoma, and that at least one of the causes of glaucoma is an injury.

Defendant, on the other hand, takes the very definite position that plaintiff never received the injury claimed while in its employ and refutes the claim that the alleged blow or injury could have caused a glaucoma. It is defendant's contention that plaintiff had been a diabetic from an early age; that when he was 18 years of age he had well-known symptoms of the insidious disease; that

diabetes "runs in plaintiff's family"; that in 1939 when he was 27 years of age sugar was found in his urine when examined by a doctor; and that as a result of that examination, according to plaintiff's own testimony, he knew of something "possibly being wrong," but from that time on until August 1948, a period of more than eight years, he never had his urine checked again, his blood examined, nor any physical examination. It is therefore defendant's claim, based on supporting medical testimony, that the sole cause of plaintiff's blindness was that he neglected to take care of his diabetic condition. In any event, the record shows that subsequent to his alleged injury plaintiff lost the sight of his left eye in November 1948 and that by May 1949 he had lost the sight of both eyes.

The jury returned a verdict for plaintiff. Thereafter, defendant moved for judgment notwithstanding the verdict or a new trial, and, upon denial, this appeal was taken.

While there is much conflict in the record as to whether plaintiff was injured at the time and in the manner claimed by him and as to whether his blindness was caused in part at least by a blow on his head or was caused solely because he neglected a diabetic condition, as claimed by defendant, we must examine the record in the light most favorable to the prevailing party. It will serve no useful purpose to review in detail the voluminous testimony, pro and con, in connection with the disputed fact issues of whether plaintiff ever received the injury and what was the cause of his blindness. Those were matters for the jury to consider and determine. While the fact questions were close, there was evidence from which a jury could find as it did on both issues. Therefore we shall consider the assignments of error and legal questions raised by defendant on appeal.

Defendant assigns as error that the trial court erred (1) in overruling defendant's objections to questions asked of two of its doctor witnesses on cross-examination respecting medical textbooks; (2) in denying defendant's motion for a new trial on account of claimed misconduct of plaintiff's counsel in making improper and prejudicial references to medical textbooks and other remarks in his closing argument; (3) in denying defendant's motion to strike opinion testi-

476

mony of one of plaintiff's doctor witnesses which it claims was based on assumed facts not supported by the evidence; and (4) in denying defendant's motion for a new trial on the ground that the verdict was not justified by the evidence, was excessive, and appeared to have been awarded under the influence of passion and prejudice.

The legal questions raised by defendant which we shall consider in connection with its assignments of error are these:

(1) May a medical witness for defendant who has not based his testimony on medical books be questioned on cross-examination by plaintiff's counsel as to views differing from his in medical text-books which such witness does not recognize as authorities, and may such witness be asked on cross-examination to give the names of medical textbooks which disagree with plaintiff's theories?

(2) When medical textbooks are not in evidence for purposes of impeachment or otherwise, may plaintiff's attorney properly tell the jury in closing argument that the medical books contradict defendant's medical witnesses, and was plaintiff's attorney guilty of misconduct in his closing argument?

(3) Did the trial court err in refusing to strike opinion testimony which defendant claimed was based in part on assumed facts not supported by the evidence?

 Defendant argues that plaintiff's attorney deliberately misused medical textbooks on cross-examination and that the trial court erred in overruling its objections; for example, that in the cross-examination of defendant's witness, Dr. Hugo Linden Bair, plaintiff's attorney deliberately set about to create an impression in the minds of the jury that the doctor's views were contrary to those expressed in the medical books. Defendant contends that those were improper and unfair tactics inasmuch as the doctor was an experienced specialist in eye disease, who had been on the staff of the Mayo Clinic at Rochester for more than 17 years and was fully qualified to and did testify and give expert opinions on the basis of his own experience and his knowledge of plaintiff's condition.

It appears from the record that Dr. Bair was a graduate of Harvard Medical School in 1929; that he interned in Boston Memorial Hospital until January 1931; that he was a resident doctor in ophthalmology (diseases of the eye) in the Massachusetts Eye and Ear Infirmary until October 1931; that he was research assistant in the laboratory at Harvard Medical School in ophthalmology until December 31, 1933; that he was a member of various medical societies, including the American Medical Association; that since January 1, 1934, he has been an eye specialist and consultant in ophthalmology at the Mayo Clinic in Rochester, where he was on the permanent staff at the time of the trial; and that he was, and had been for about eight years before the trial, an associate professor of ophthalmology in the graduate school at the University of Minnesota.

Plaintiff's first visits to the Mayo Clinic were on October 4 and 5, 1948. He returned there on October 13, and remained until November 10. An operation was performed on his left eye on November 2. He returned for a checkup on November 24, 1948, and continued to receive treatment at the clinic from time to time until about May 12, 1949. During those times he was under the general care and supervision of Dr. Bair. The doctor testified that it was his opinion that there was no causal connection between the alleged injury of plaintiff on June 20, 1948, and his blindness and that his blindness was "the net result of the prolonged diabetic retinopathy."

Defendant strongly urges that inasmuch as Dr. Bair did not base any part of his testimony on medical textbooks nor did he recognize as medical authorities the books referred to on cross-examination by plaintiff's attorney, the books had no place in his cross-examination. In order to give a more comprehensive understanding of the claims of defendant that the trial court erred in overruling its objections respecting medical textbooks, we quote excerpts from the cross-examination of Dr. Bair:

"Q. Doctor, it is recognized by Dr.—you are acquainted with Dr. May's work, are you not, his book?

"A. I have read his book.

478

"Q. And you recognize him as one of the outstanding authorities in the eye field, do you not?

"A. Not necessarily, no.

"Q. Well, Doctor, is he recognized as one of the outstanding men?

"A. I can't even answer that.

"Q. Well, you have read his book, have you not?

"A. Yes.

"Q. And do you disagree with him that glaucoma—withdraw that—one of the causes of glaucoma, that is acute glaucoma, is injury, is it not?

"A. At least one of them; you must be specific as to the injury.

"Q. What is that?

"A. You must be specific; there are all sorts of injuries.

"Q. Yes, but here is the thing, as far as an injury is concerned, an injury will cause an acute glaucoma?

"A. What kind of injury?

"Q. Anything that is sufficient enough, Doctor, to cause inflammation or congestion to the eye?

"A. I couldn't answer that."

Later in his cross-examination of the doctor, plaintiff's counsel again referred to Dr. May and his book as follows:

"Q. And I think you recognize Dr. May also, do you not?

"A. Not as an authority; his is a very elemental textbook.

"Q. Do you know of Dr. May?

"A. I have heard of him.

"Q. As a matter of fact, his book is used by a great many eye doctors throughout the country?

"A. I would doubt that."

Plaintiff's counsel questioned Dr. Bair on cross-examination with reference to medical books as follows:

"Q. Now, Doctor, are you acquainted with an authority on eyes by the name of Louis Salinger?

"A. I have heard of Dr. Salinger. I don't know whether he is necessarily an authority.

"Q. You have read the book in connection with your work?

"A. I don't recall reading his book specifically, I have seen the book."

Defendant argues that despite the fact that Dr. Bair did not base any part of his testimony on medical textbooks nor recognize as medical authorities any of the books referred to by plaintiff's counsel on cross-examination, plaintiff's attorney used the medico-legal textbook Legal Anatomy and Surgery by Dr. Bernard S. Maloy in the following manner:

"Q. * * * Now, Doctor, are you acquainted with Bernard S. Malloy, also?

"A. No.

"Q. You are not acquainted with his work? Well, Doctor, will you just read that place, calling your attention to where I am—

"Mr. McGough: Objected to as improper cross examination.

"The Court: Are you asking him to read it out loud?

"Mr. Rerat: No, not out loud.

"A. Yes.

"Q. Are you familiar with the fact that Dr. Malloy states that diabetic retinitis is not a common—

"Mr. McGough: Objected to as improper.

"The Court: Let him ask his question.

"Mr. Rerat: I am just trying to ask a question.

"The Court: You may.

"Mr. McGough: In order that the record may not be encumbered by continual objections to this cross examination, may the defendant have a continuing objection to all of the questions asked of Dr. Bair upon cross examination upon the ground that it is improper cross examination, hearsay, and not the best evidence?

"The Court: The defendant may have a continuing objection as requested.

"Q. Now, Doctor, are you familiar with Dr. Malloy's work?

"A. No."

After some further questioning about Dr. Louis Salinger's books, the witness testified that he had neither read those books nor did he recognize Dr. Salinger as an authority in the eye field. He commented that writing a textbook did not necessarily make one an authority. Defendant argues that plaintiff's attorney then continued to pursue the cross-examination in other and improper ways as follows:

"Q. I am going to ask you, give me the names of the books that you recognize as the authorities in this field.

"Mr. McGough: On what subject?

"Q. I am talking now about the fact that acute glaucoma cannot be caused by injury, that acute glaucoma cannot be caused by an emotional upset and worry, and disturbance.

"Mr. McGough: Objected to as improper cross examination.

"The Court: Overruled. He may answer whether he has any authorities in mind that he recognizes as such.

"A. I use several text books as authorities, but with reservations, depending on my own experience.

"Q. Doctor, can you tell this Court and jury any text books that are recognized as being the authorities for the treatment of injuries of the eyes, where the author states specifically that an acute glaucoma is not one of the causes—is not injury, including injuries to the back of the head; can you cite me one.

"Mr. McGough: Objected to, if the Court please, as improper cross examination. This witness has stated he has certain books he considers with reservations.

"The Court: This goes back to his statement that no injury caused it, therefore the cross examination is proper; he has stated that it didn't cause it. Overruled.

\* \* \* \* \*

"Q. I am going to reframe it, Doctor, will you give us the name of any text book which book is written by a man who is well-versed, and who is recognized by eye doctors, as an authority, at least one of the authorities in this particular field, where the author who has written this book has any place in the book that acute glaucoma

cannot be caused by injury, including an injury to the back of the head?

"A. No, I can't tell you any; my memory would fail me if I tried to remember all that."

Defendant then goes on to argue that, inasmuch as Dr. Bair did not rely on medical treatises in the opinions he expressed, the references which plaintiff's attorney made on cross-examination to medical textbooks were not made for the purpose of contradicting any testimony which the doctor had given but, rather, to attempt to convey the impression that the doctor's opinions had no support in the medical books.

In connection with Dr. Bair's statement that he had read several textbooks with reservations, he was asked:

"Q. Give me the names of the text books that you have read with reservation, in other words, by reservations in all those books you accept some of their work, and some you don't accept?

"A. Well, the Graefe-Saemisch Handbuch.

\* \* \* \* \*

"Q. What are the other books?

"A. Hurzes Handbuch, Furd Gesonnte Ophthamology [Ophthalmology]. They are all in German.

"Q. Do you have any in English?

"A. Sir Stewart duke-Elder.

\* \* \* \* \*

"Q. Now, Doctor, give us some others.

"A. Berens Textbook of Ophthalmology, published in English.

"Q. Are those others in German.

"A. Yes, they are in German.

"Q. I am Irish and French, I wouldn't be able to read German; that is not the reason you gave them to us?

"A. No, I recognize them as outstanding reference books.

\* \* \* \* \*

"Q. What else, Doctor?

"A. I can think only of the recent ones; Sir Herbert Parsons, that is an English textbook in Ophthalmology.

"Q. Anybody else?

"A. I can't think of any right now—wait a minute. Foster Moore on Medical Pathology; there are a large number; I can't remember them all.

"Q. Can you remember any more? I want to check over every book that you stated."

Defendant further contends that plaintiff's attorney continued to build up Dr. May's textbook as a contradictory authority in his later cross-examination of Dr. Edward P. Burch of St. Paul, a witness for defendant who had testified that in his opinion plaintiff's loss of vision was the end result of a severe and rather long-standing diabetes mellitus. With reference to the textbook incident, we quote in part from the cross-examination of Dr. Burch:

"Q. And, Doctor, then I will ask you this, if you are familiar with May's work?

"A. That is an elementary textbook; we have all read that.

"Q. I am just asking if you are familiar?

"A. I apologize, I read it.

"Q. It is used by doctors?

"A. Mostly by medical students.

"Q. At least it has the fundamental principles for medical students and doctors to read?

"A. Yes, sir.

\* \* \* \* \*

"Q. I ask you whether you differ with Dr. May in regards to that injury, a blow to the head—

"Mr. McGough: Object to this form of question in attempting to get in indirectly what we cannot get in directly. Stating what Dr. May states.

"Q. He said he was familiar with Dr. May's books. Recognized medical journals can be used for impeachment, and he says he recognizes it as an authority.

"The Court: I was wondering if you have a passage out of it.

"Q. I will start over again. You stated that you were familiar with Dr. May's work?

"A. I read it, perhaps 20 years ago.

"Q. Yes, and it is at least—he is recognized as an authority, as one of the authorities on eyes, is he not?

"A. I wouldn't say so, Mr. Rerat.

"Q. His book is used by all the colleges and universities—

"Mr. McGough: Objected to as immaterial.

"A. I wouldn't know; I only went to one, and we didn't use it.

"Q. You said that you were familiar with it, Doctor, and I was wondering as to what colleges—

"A. Well, Dr. May has been dead for some time, for your information, and lots of changes have taken place since his demise."

Summarized, it is defendant's general conclusion in its argument on this phase of the case that, inasmuch as Dr. Bair did not rely on medical treatises in the opinions which he expressed but rather on his own experiences, knowledge, and treatment of plaintiff, there was not any justification or excuse for referring to the medical textbooks in the cross-examinations; that under the circumstances the only reason they were used, especially in the case of Dr. Bair, was to lessen the weight of the medical testimony by leaving the impression with the jury that it was directly opposed to the published views of the medical text writers; and that, therefore, the methods followed on cross-examination, over objections, were clearly prejudicial. Defendant maintains that this condition became even more clearly apparent in the closing argument of plaintiff's counsel, from which we quote parts complained of by defendant:

"* * * I tried to be fair with him. As this X-ray man says, medicine is a funny thing; sometimes you can't always tell. And the Court will tell you you can use your own judgment about these various things. I tried to be fair with him. In other words, is there anything unfair that I said to Dr. Bair? Dr. Bair said this—I

asked him this, I said, Doctor, I said, isn't it true that every text-book—I didn't limit it to Dr. May—they tried to even belittle text-books that we try to bring before you to help them, they didn't bring any textbooks at all—I said to him here, doctor, isn't it true that not only Dr. May, not only Dr. Salinger, but I said every single textbook that is written in the entire United States, I said they say in these textbooks that acute glaucoma can be caused by injury, either an injury, a blow, or when you receive an injury, if it caused you to be emotional, upset, and you are worried, and you have sleepless nights, and your condition is upset, that is another cause of acute glaucoma, is that not correct? I wanted him to show me where one textbook said that acute glaucoma is caused from, as he tries to say, as the inference was here, from any diabetic condition. I said to him here, doctor, which was fair, I said here, I said, doctor, give me the names of some textbooks, or even one textbook—if I was unfair about that, don't hold that against my client, folks —I tried to do the best I could, but I think it was a fair question; I said, doctor, I said, you tell me the name of one book, I don't want two—there are hundreds and hundreds of books that are written on this proposition—I said one book, doctor, that agrees with what you say, that acute glaucoma cannot be caused from an accident, that it cannot be caused from emotional upset following an accident, one textbook please—that is where the men get their information, that is where the students get all their information from, that is their Bible, and he said, no, not one. In other words, why did he say that? He said that because if he had admitted, like he should have done, that acute glaucoma is caused by injury, that acute glaucoma is caused from the effects of injury, his hypothetical question, and the fact that this man's blindness was caused by his diabetic condition, that goes out of the window, that is why Dr. Bair didn't admit that, and I said to him, Dr., I am wondering what kind of books do you read, and you saw how—again I say actions speak louder than words; you saw that man's face, red, all nervous, excited. Why? I will tell you why; because down in his heart and down in his soul that man knew that he wasn't

doing the right thing. I said, doctor, give me the names of some textbooks that you have read, even though the description, even though all of the other medical authorities in the world, have that in their books, that acute glaucoma can be caused from injuries or the effects of injuries, and what did he say? He gave me something in German. I like that all right, but I can't read it, I couldn't read those books. Now, think of it, he is giving me and you and back here, Hugh Plunkett—he was trying to get the names down, all German books. I say to you men and women on the jury that even though this man has probably a better knowledge than you and I have, he cannot fool us that way, and I saw you people look at him when I asked him that very simple question, and again I say that if you will go ahead and agree that all these medical books say that glaucoma is caused by injury or the effects of injury, then his opinion goes out of the window, and that is a fact, because he couldn't name one book. If there is only one, he would have named it. Now, I want to say that I have no quarrel with him; God forgive him, that is all I have got to say of him."

In line with its position defendant continues to argue that it was well known that there were no medical textbooks in evidence and that neither side could have introduced any in evidence and that, even so, plaintiff's counsel undertook to draw unfair and improper inferences from defendant's failure to bring in textbooks and broadly implied that the medical textbooks were contrary to the views of its doctors, especially Dr. Bair.

Defendant further calls our attention to another part of the argument of plaintiff's counsel to the jury with reference to doctors. Before quoting the part complained of by defendant, it must be said that just prior to that point in his argument plaintiff's counsel had been reviewing the qualifications, experience, and abilities of certain doctors testifying on behalf of plaintiff in an effort to overcome what he claimed was an attempt by the defendant's counsel to belittle or undermine those doctors. He then came to the part of the argument objected to by the defendant:

"* * * I have got to be fair with the doctors; after all, I have no quarrel with the men who testified on the other side; as a matter of fact, some of my good friends, they testified for the defense; I don't hold that against them. Why, they tell me, they say that is our bread and butter, and we certainly are going to give these defendants, these companies the best of it, if there is any question, if there is a close question where it can go either way, sure we are going to give them the best of it. I told them that is all perfectly all right—

"Mr. McGough: This is objected to as entirely outside of the record.

"Mr. Rerat: That is perfectly all right, ladies and gentlemen—

"The Court: It is."

Defendant argues that its doctor witnesses would never have made such statements to plaintiff's counsel and that, under any circumstances, such comments would have been entirely outside the record. It contends that the ambiguous remark made by the court following defendant's objection might well have been interpreted by the jury as meaning that it was "perfectly all right" for plaintiff's attorney to have made that statement. While it is our opinion that in this particular incident what the trial court did, or attempted to do, was to sustain the objection, it must be conceded that in view of counsel's statement in between the objection and the court's ruling there might have been some misunderstanding on the part of the jury as to just what the court ruled. A more positive and unequivocal ruling on the objection under such a circumstance would have been more desirable.

In contrast with defendant's general position, plaintiff contends that there was no prejudicial error in connection with his attorney's references to medical textbooks in cross-examining defendant's medical experts. He takes the position that Dr. Bair testified as a medical expert for defendant and that as a foundation for his testimony he said that he was a graduate of Harvard Medical School, a consulting eye specialist at the Mayo Clinic for 17 years,

and an associate professor of ophthalmology at the graduate school of the University of Minnesota for eight years. Plaintiff argues that the doctor testified to the effect that plaintiff's blindness was due solely to diabetes and that there was no causal connection between the blow which plaintiff claims to have received on June 20, 1948, and his blindness and that this testimony was directly opposite to the testimony of plaintiff's three expert medical witnesses. Plaintiff contends that Dr. Bair's opinions were based upon a hypothetical question which permitted the doctor, as a basis for his answer, to use not only his experience but his education; that the doctor had testified that he had used several textbooks as authorities, but with reservations, depending on his own experience; and that he had named several textbooks which he had read "with reservations." Plaintiff therefore argues that the doctor's testimony was such as to require a thorough and full cross-examination. He maintains that under those circumstances it was proper for his attorney to determine what books were recognized as authorities by the medical profession so as to use the same in framing questions for the purpose of testing the knowledge and competency of the witness, the accuracy of his conclusions, and the weight to be given to his opinions. He reasons that, inasmuch as the doctor's conclusions were based in part upon his education, and in view of his teaching experience at the University of Minnesota, it was proper for plaintiff's counsel on cross-examination to determine to what extent his conclusions—which were opposite to those of plaintiff's doctors—were based upon his experience as a teacher and his readings. He urges that the facts in this case required, and the law permitted, a full and complete cross-examination, citing as authority, among other cases, Mattfeld v. Nester, 226 Minn. 106, 32 N. W. (2d) 291, 3 A. L. R. (2d) 909.

The Mattfeld case involved two consolidated actions by a husband as special administrator for the wrongful death of his wife arising out of an automobile collision on January 27, 1946, and in his own behalf for consequential damages. After the accident plaintiff's wife was under the care of Dr. W. She was discharged

from a hospital in her home town on April 27, 1946, at which time, according to Dr. W.'s testimony, her condition was good except for the fracture. After her return home, however, she declined physically and mentally. On August 15, 1946, Dr. B. was called. After a tentative diagnosis, Dr. B. concluded that she might have neuritis, a nerve or spinal cord injury, or an injury to the brain. On September 30, 1946, he sent her to a hospital in St. Paul for orthopedic and neurological examinations by specialists. She was returned to her home-town hospital on October 14 and died the following day. It was Dr. B.'s opinion, given without objection, that the accident caused her death, based on his assumption that her injuries were those previously mentioned in the case; that the terminal or direct cause of death was lobar pneumonia; and that this in turn was caused by her injuries, which caused her to decline physically. While the fact situation there differs from that in the instant case, this court said with reference to Dr. B. that after an expert's opinion had been properly received, as in that case, cross-examination is for the purpose of testing the weight of his testimony; that generally a wide range of inquiry should be allowed on cross-examination within the discretion of the trial court; and that it would have been permissible on cross-examination of Dr. B. in that case to elicit any facts showing bias, prejudice, or interest on the doctor's part, if any; the basis, extent, and other matters concerning his knowledge of causes of death in cases like the one under consideration there; the scientific basis, or lack of it, for any medical facts or rules which the doctor expert used in making an inference from the facts upon which he based his opinion that the accident in that case was the cause of the person's death; the particular application of such medical facts and rules to the facts of that case; the existence of the facts concerning the person's injuries, illness, and condition to which the doctor testified and which formed part of the predicate for his opinion; and his experience and ability to apply the medical facts and rules to the case in which he was testifying.

Defendant contends that plaintiff's attorney did not keep his cross-examination of its doctors within permissible limits and reiterates that the tactics already referred to with reference to medical textbooks and the closing argument of plaintiff's counsel deprived it of a fair and impartial trial.

In connection with the testimony of Dr. Bair, the situation is somewhat different from that of the ordinary medical expert basing his opinion primarily on a hypothetical question. Prior to answering a hypothetical question, Dr. Bair had testified extensively as to the care and treatment given plaintiff while under his general care and supervision, covering a period from about October 4, 1948, until about May 12, 1949. The doctor, on direct examination, had gone into great detail regarding the plaintiff's history and examinations given plaintiff while a patient at the Mayo Clinic, the condition of the plaintiff, and the treatment furnished him at various times while under the doctor's care. While testifying, he referred to many photostatic exhibits as exact photographs of the Mayo Clinic originals and gave a broad review of the care, treatment, and history of plaintiff while under his general supervision. After this prolonged testimony, Dr. Bair was then asked on direct examination:

"Q. * * * basing your answer upon all the information given by Mr. Briggs [plaintiff] to the Mayo Clinic, from October 4, 1948, to May 12, 1949, all of which appears in Plaintiff's Exhibits 2-A to W, together with your own examination of the plaintiff, of which you testified here today, have you an opinion as to the cause of Mr. Briggs' blindness in both eyes?

"A. I do have such an opinion.

"Q. Will you state it please.

"A. His blindness is the net result of the prolonged diabetic retinopathy; infection of the retina due to diabetes."

Following that testimony, Dr. Bair was asked if he was present in court on a previous occasion when plaintiff and his wife testified, and the answer was "no." He was then asked to assume certain

facts to be true in addition to certain facts which appeared in the Mayo Clinic records and was submitted a hypothetical question covering several pages of the record including a history of the alleged accident and a prolonged review of the treatments and conditions of plaintiff, which plaintiff's attorney supplemented with certain things which he considered important. The doctor was then asked:

"Q. Assume then, Doctor, that the things mentioned by Mr. Rerat were claims made and testimony given by the plaintiff in this case, I will ask you whether you have an opinion is there any causal connection between the alleged blow which plaintiff testified he received on June 20th, 1948, and his blindness?

"Mr. Rerat: Taking into consideration the things that I told you are true.

"The Court: That is part of the question, that his claims that were related, that he made, are now part of it, objection overruled.

"A. I have an opinion.

"Q. What is your opinion.

"A. That there is no causal connection between such an alleged injury and the blindness of the patient.

"Q. Assuming the same set of facts to be true, Doctor, that I have set forth in my previous hypothetical question, what is the cause of Mr. Briggs' blindness?

"A. It is the net result of the diabetic retinopathy which I said before.

"Q. Now, assume the facts on which you have stated an opinion, can you now tell us, have you an opinion whether the blow which plaintiff now claims he received on June 20th, 1948, contributed to his blindness, have you an opinion?

"A. I have an opinion.

"Q. What is your opinion?

"A. That it didn't contribute to the blindness."

There was no actual attempt to introduce medical textbooks in the matters under dispute here. The great weight of authority holds that medical books or treatises, even though properly identified and authenticated and shown to be recognized as standard authorities on the subjects to which they relate, are not admissible in evidence to prove the truth of statements contained in the books. Hallworth v. Republic Steel Corp. 153 Ohio St. 349, 91 N. E. (2d) 690; Annotation, 65 A. L. R. 1102; 20 Am. Jur., Evidence, § 968. The reasoning used in the Hallworth case was that, if this kind of evidence were admitted, a party could find a textbook which supported his case and, by introducing it or a part of it in evidence, he would have a witness in the jury room on his side of the case even though such witness had not been under oath and had not been subject to cross-examination. The rule was expressed by this court in Landro v. G. N. Ry. Co. 117 Minn. 306, 309, 135 N. W. 991, 992, Ann. Cas. 1913D, 244, where the trial court permitted the cross-examination of defendant's expert witnesses as to opinions expressed by a so-called standard medical authority which were contrary to those given by the witnesses. Upon appeal this court said:

"* * * Of course, medical books, however celebrated their authors, are not admissible in evidence, because the author is not under oath, and not subject to cross-examination. But, *for the purpose of testing the qualifications, as well as the credibility, of an expert, it is generally held,* as in Wittenberg v. Onsgard, 78 Minn. 342, 81 N. W. 14, 47 L. R. A. 141, *that when the witness has testified that the authorities support his view,* he may be asked on cross-examination whether a medical work, admitted by him to be a standard authority, does not express a contrary view." (Italics supplied.)

The authorities are greatly divided on the question of the right of counsel to refer to or use medical works on cross-examination of an expert witness *where the witness does not rely on such authorities as a basis for his opinion.* One line of cases is to the effect that one testifying as an expert cannot be impeached or contradicted by questioning him on cross-examination with reference to medical

or other scientific works where he does not purport to base his opinion in whole or in part upon such authorities. On the other hand, there are authorities which give the right to cross-examine an expert witness with reference to what medical or other standard authorities teach on the subject under investigation. This doctrine has been sustained, apart from reliance upon medical authorities by the witness, on the theory that such cross-examination is proper within reasonable limits, which is a matter largely for the court's discretion, in order to test the knowledge and accuracy of the witness. It will serve no necessary purpose under the facts and circumstances of the instant case to attempt to explain or distinguish the many cases on this subject. It is sufficient to say that they are collected in Annotation, 82 A. L. R. 448, 453. Included in the group of latter holdings is Ruud v. Hendrickson, 176 Minn. 138, 222 N. W. 904, cited by both parties herein.

While we do not regard the fact situation in the Ruud case in point with that in the case at bar, the sole question presented there on appeal was whether the trial court erred in permitting defendant to read extracts from medical works in framing questions asked plaintiff's medical expert on cross-examination. In that case a doctor was sued for alleged malpractice in connection with the care and treatment furnished a seven-year-old boy for injuries to his arm which resulted in what was termed Volkmann's contracture. On direct examination a medical witness, testifying as an expert for plaintiff and basing his opinion on the facts recited in a hypothetical question, had stated that the treatment given the injury was not in accordance with the usual practice of ordinarily skilled members of the profession. On cross-examination, the witness described the condition known as Volkmann's contracture and mentioned certain doctors who had written about it. He also said that the books held up that condition as typical of what tight bandaging would do. Defendant was then allowed to read passages from several medical books which differed from some statements made by the witness but *which he recognized as authorities* and which he agreed correctly stated the doctrine and practice of the profession.

This court, in affirming the trial court, said that under those circumstances it was proper on cross-examination to develop the theories and practice of the profession in respect to the injuries involved and that in the framing of questions for that purpose it was permissible to read extracts from works or publications recognized by the profession as authority on such matters. The court also said (176 Minn. 139, 222 N. W. 904):

"Although it is well settled that medical works are not admissible as substantive evidence for the reason that the authors are not under oath nor subject to cross-examination, yet where a physician testifying as an expert bases his opinion, in whole or in part, on such works, he may be questioned on cross-examination as to views differing from his *in books which he recognizes as authority,* although it may incidentally place the views of the authors before the jury. Wittenberg v. Onsgard, 78 Minn. 342, 81 N. W. 14, 47 L. R. A. 141; Landro v. G. N. Ry. Co. 117 Minn. 306, 135 N. W. 991, Ann. Cas. 1913D, 244; Moehlenbrock v. Parke, Davis & Co. 141 Minn. 154, 169 N. W. 541." (Italics supplied.)

Plaintiff contends that Dr. Bair based his opinion in answer to defendant's hypothetical question on his reading as well as on his experience and that the doctor relied in general, with reservations, upon medical textbooks as authorities. He concludes, therefore, that there was no prejudicial error because his attorney referred to medical textbooks in his cross-examination of defendant's medical experts. A review of Dr. Bair's testimony in its entirety does not satisfy us that he based his opinions in answer to defendant's hypothetical questions entirely upon his reading as well as his experience and that he therefore relied in general upon medical textbooks with reservations. Rather, it appears to us that the doctor placed a much greater reliance in his answers upon the medical history of plaintiff and the care and treatment furnished the patient while under his general supervision intermittently over a period of about seven months from October 4, 1948, until the following May 12.

There are situations where medical books may properly be used in the cross-examination of medical experts for purposes of impeachment. If a medical expert has undertaken to base his opinions on medical authorities, he may be cross-examined with reference to them. For example, where an expert witness has assumed to base his opinion upon a particular medical book, he may be cross-examined with reference to it, and parts of the book which contradict him may be read into the record. Pinney v. Cahill, 48 Mich. 584, 12 N. W. 862; City of Ripon v. Bittel, 30 Wis. 614. This rule may be applied in a situation where the expert has testified that the authorities support his views. In such a case he may be questioned on cross-examination as to whether a medical work, admitted by him to be a standard authority, does not express a contrary view. Wittenberg v. Onsgard, 78 Minn. 342, 81 N. W. 14, 47 L. R. A. 141; Landro v. G. N. Ry. Co. 117 Minn. 306, 135 N. W. 991, Ann. Cas. 1913D, 244; Ruud v. Hendrickson, 176 Minn. 138, 222 N. W. 904. Inasmuch as medical books are not admissible as original evidence, it therefore must follow that they are not admissible on cross-examination where the introduction or reference was not for the purpose of directly contradicting some assertion of the witness but only to prove some contrary theory. City of Bloomington v. Shrock, 110 Ill. 219, 51 Am. R. 678, quoted with approval in Moehlenbrock v. Parke, Davis & Co. 141 Minn. 154, 161, 169 N. W. 541, 544.

In Allen v. Boston Elev. Ry. Co. 212 Mass. 191, 98 N. E. 618, the trial court, over objection, had permitted defendant's medical expert to be subjected to an extended cross-examination directed mainly to showing what the opinions of other authorities were as to the effect of alleged injuries in causing the disease of diabetes mellitus. The court permitted the witness to be asked if certain authorities did not express certain views and if that did not change his opinion. Plaintiff's counsel was permitted to ask whether the witness was familiar with any authorities which said diabetes mellitus might come as a result of a blow. On appeal, this was held to be reversible error, as the court said that the whole effect of the cross-examination was to impress upon the minds of the jurors the

idea that certain writers were men of eminence in medicine whose opinions were of value, and that their opinions differed from the opinion to which the witness had testified. The court said there (212 Mass. 194, 98 N. E. 619):

"In the present case the objectionable cross-examination, against the repeated objection and exception of the defendant, was continued * * *. Similar questions were put in different forms as to different treatises, ending with general questions calling for and eliciting answers as to any text books that might agree with the claim of the plaintiff, and accompanied by the display of several medical books on the table of the counsel. As in Kaler v. Builders' Mutual Fire Ins. Co. 120 Mass. 333, 335, 'the effect, and as may reasonably be supposed the purpose,' of counsel were to bring before the jury the opinions of others who were, it was suggested, persons skilled in such matters, and to lessen the weight of the witness's testimony by showing that their views were different from his."

See, also, State v. Blackburn, 136 Iowa 743, 114 N. W. 531.

Without going into more extended details in the case at bar, it is our opinion that there is merit to defendant's assignments of error in connection with the part of the cross-examination of Drs. Bair and Burch with reference to medical textbooks. We believe also that certain remarks made by counsel for plaintiff in his closing argument with reference to medical textbooks and otherwise, as set forth above, were improper and prejudicial. For those reasons, it is our opinion that a new trial should be granted.

We cannot agree with plaintiff's argument that no objections were timely made by defendant with reference to what it considered improper and prejudicial references to medical textbooks and that, therefore, they cannot be reviewed on a motion for a new trial or on appeal. The record shows a continuing objection as to certain questioning about medical textbooks on the part of defendant, as well as many objections during the course of the trial. While defendant did not object at the conclusion of the argument to certain points now raised as objectionable, he did object at one point during

the course of the argument, as set forth above, to statements of counsel as being outside the record. However, we believe that with reference to certain parts of plaintiff's closing argument the trial court, on its own motion, should have taken action upon it as we said in Magistad v. Potter, 227 Minn. 570, 571, 36 N. W. (2d) 400, 401:

"Exceptions to counsel's remarks to the jury were neither taken at the time they were made nor at the close of his argument, as permitted by the district court rule, but only after the court had charged the jury. However, we regard the argument as so prejudicial and so calculated to excite prejudice and passion that the trial court, of its own motion, should have taken action upon it."

■ We cannot agree with defendant's assignment of error that the trial court erred in denying its motion to strike certain testimony of plaintiff's witness, Dr. Frank T. Cavanor, as based on assumed facts not supported by any evidence. In view of our decision that a new trial should be granted, we deem it unnecessary to go into any great detail with reference to this assignment. A review of the doctor's testimony in its entirety indicates to us that he was not claiming that a ruptured eardrum was the essential basis for his opinion. While it appears that he gave some weight to certain testimony that blood was found in plaintiff's eardrum some time after the accident, it also appears that in basing his opinion he took many other things into consideration which were in evidence.

Because of our decision, we deem it unnecessary to discuss defendant's assignment of error that the verdict was not justified by the evidence and was excessive.

Reversed and new trial granted.

Mr. Justice Christianson took no part in the consideration or decision of this case.

Mr. Justice Roger L. Dell, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.