## MARGARET ZUBRYSKI v. MINNEAPOLIS STREET RAILWAY COMPANY AND ANOTHER.[1]

January 21, 1955.

No. 36,354.

---

[1]Reported in 68 N. W. (2d) 489.

*Ray G. Moonan* and *Frank X. Cronan,* for appellants.

*Meagher, Geer, Markham & Anderson, David W. Nord,* and *O. C. Adamson II,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order denying defendants' motion for judgment notwithstanding the verdict or for a new trial.

On October 16, 1949, at about 11:53 p. m., a collision occurred between a car driven by plaintiff's intestate, Peter Zubryski, and a streetcar owned by defendant Minneapolis Street Railway Company and operated by its motorman, defendant John K. Donaldson. Zubryski was killed instantly. The accident occurred on Thirteenth avenue northeast, which runs generally east and west, between Marshall and Ramsey streets, both of which run generally north and south. Thirteenth avenue northeast is 43 feet wide from curb to curb at that point. There are two sets of streetcar tracks on Thirteenth avenue as it crosses Marshall street. These tracks are spaced five feet apart, and the outside tracks are each 14 feet from the curb. At a point 185 feet west of this intersection the most northerly or westbound set of tracks begins to curve slightly toward the southerly or eastbound tracks. Forty-eight feet from this point the south rail of the westbound tracks crosses the north rail of the eastbound tracks, and 26.6 feet west of this point the westbound tracks wye or completely merge with the eastbound track. Ramsey street, which is completely taken up with railway tracks, is 70 feet west of the wye and is 66 feet wide.

Defendant Donaldson testified that, traveling in a westerly direction as he approached the point where the westbound tracks begin to curve toward the eastbound tracks, he was going from eight to ten miles per hour. After he made the turn and as he approached the wye, he was going from two to four miles per hour. He first saw the Zubryski car when he was just going into the curve. He did not apply his brakes or try to stop at that point. He estimated the

speed of the Zubryski car to be 55 to 60 miles per hour. While he did state that the Zubryski car was at all times on its own side of the street, he stated that as Zubryski approached Ramsey street he was traveling close to the curb but as he crossed the west line of Ramsey street he started to turn out toward the center of the street. He stated that as Zubryski crossed the east line of Ramsey street he began to swerve to the left and that immediately before the impact the Zubryski car turned to its right. The impact occurred at the point where the front wheels of the streetcar wye into the eastbound tracks or about 260 feet west of Marshall street. Contact of the two vehicles was with the left front part of the streetcar and the rear part of the left front fender of the automobile. The Zubryski car came to rest about 70 to 80 feet east of the point of impact, with its rear wheels over the south curb and the front wheels in the gutter. Donaldson testified that he had applied the brakes as the Zubryski car crossed the east line of Ramsey street and that the streetcar was completely stopped at the time of the impact.

John B. Stout, who was a passenger on the streetcar at the time of the accident, testified that the streetcar conductor had thrown on the brakes simultaneously with the impact; that the streetcar had not stopped before the impact; and that "after he threw the brake on, maybe he went three or four feet."

It is not clear just where the Zubryski car was when Donaldson first saw it. At one point during the trial Donaldson testified that the Zubryski car was 300 feet west of him when he first saw it. The next day of the trial he changed this distance to 560 feet after having paced off the distance at the scene of the accident the night before. On cross-examination, Donaldson admitted that certain street conditions in the general locality had been changed between the time of the accident and the night he paced off the distance, but he claimed that he still could determine the correct distance.

Donaldson also testified that there are no signal lights on a streetcar which warn oncoming cars that a streetcar is going to make a left-hand turn. In answer to the question: "So far as you know, Mr. Donaldson, at any point near or adjacent to the single track

was there any sign established on the street to advise motorists of the single track situation?" he replied: "I can't recall whether or not there was a red flag overhead on the trolley wire." He said, however, that this possibly could not be seen at night.

It further appears from the record that on the night of the accident Zubryski was on the way to the home of a relative where his wife was staying; that the street he was traveling was the most direct route; and that he was familiar with it. It appears also that at the time of the impact the overhang of the streetcar extended over the south track of the eastbound tracks 16 to 18 inches. This still left a clearance, according to the record, of about $12\frac{1}{2}$ feet between the streetcar and the south curb.

We have examined the record in the light most favorable to the prevailing party, but, even so, we find it difficult to see how a jury could have found negligence on the part of defendants under the facts and circumstances here. However, we are not a fact-finding body, so we are basing our decision for a new trial on other matters which might improperly have influenced the jury under the record here.

Defendants have raised several meritorious assignments of error, but, because it is our opinion that a new trial should be granted, we consider it necessary to discuss only one pertinent assignment, which is that the trial court erred in permitting counsel for plaintiff to cross-examine Goodwin Joss from special textbooks in the manner he did.

It appears from the record that decedent had worked all day Sunday, October 16, 1949, from about 7 a. m. at a service station at Penn avenue north and Broadway in Minneapolis. At about 9:30 that evening his employer and a group of other men who had been pheasant hunting arrived at the service station, and shortly after one of the members of the hunting party produced a fifth of Bourbon whiskey. There was testimony that decedent had at least two unmeasured drinks from the bottle. Goodwin Joss, a professional chemist, was called by defendants as an expert witness. There had been previous testimony that a blood test had been made after the

death of Zubryski showing that there was 0.18% ethyl alcohol by weight in his blood stream. Joss testified that in his opinion that amount of alcohol in the blood stream would reduce the mental process of a man of Zubryski's age (28), in good health, and that he would be "under the influence" even though the last man who saw Zubryski alive testified that the latter was in no way affected by the two drinks of whiskey, which were mixed with a soft drink.

Upon cross-examination of the witness Joss, plaintiff's counsel asked the witness if he was acquainted with a book obtained from the medical library of the Medical Arts building entitled "Clinical Laboratory Diagnosis." The witness answered that he knew what it was and that he might have heard of the author. He was then asked:

"Q. Well, for our purposes here would you accept this as a reasonably authoritative text on this subject, on the general subject; I don't want you to read the content but on the general subject of clinical laboratory diagnosis?

"A. I would have to look it over because I have clinical—I just obtained a new clinical book.

"Q. I know you might have done that, but I want to know about this book.

"A. What I want to see, I don't agree with a lot of their methods.
* * *

"Q. Do you know the question you are answering now?

"A. You asked me if the book was okay.

\* \* \* \* \*

"Q. For this purpose would you accept and recognize this document and this book as an acceptable authoritative book in the field that it covers?

"A. It may be.

"Q. Well, will you accept it for that one purpose?

"A. I don't know, I haven't looked at it, I don't know anything about it.

"Q. Do you mean that you have got to look at it in order to see whether or not what these authors say agree with what you say before you will accept it?

"A. Sure, I got a lot of books that I sent right back to the book company because I don't like the method, they don't seem to be right, I send them back and they are not standard. * * *

"Q. You would be afraid to recognize this book that we got from the Hennepin County Medical Library?

"A. No, I would not be afraid if I could look it over.

"Q. Wait until I finish the question. Because it might not agree with what you think the truth is?

"A. No, that's not so."

The witness was then asked if he would silently look at a table at page 790 of the book and answered that he knew the table and had practically the same table in another pamphlet. He was then asked:

"Q. All right, the question is, for this purpose would you accept that book as a reasonably authoritative document covering this subject, among the others that are covered in the book?

"A. Yes."

Following that question he was asked whether he agreed with a statement read from the book to the effect that during life the urine and blood should be submitted for examination for alcohol and if the patient dies the stomach and contents, the kidneys, liver, brain, blood, and urine should be submitted. His answer was: "Not all of it, no."

It will be noted from the above that, while the witness eventually said that he would accept the book as a reasonably authoritative document covering the subject, he apparently did so with reluctance as he said that he had not looked at the book and did not know anything about it. However, under the circumstances, it might well have appeared to the jury that the witness was trying to hold back something he might have known about the book when he was asked if he was afraid to recognize that authority even though he answered that he would not be afraid to if he could look it over. It is

our opinion, under the record here, that because of the closeness of the issue it may have taken little to prejudice the jury and that, in the interest of justice, a new trial should be granted.

In Briggs v. Chicago G. W. Ry. Co. 238 Minn. 472, 476, 57 N. W. (2d) 572, 574, one issue as we stated it was:

"May a medical witness for defendant who has not based his testimony on medical books be questioned on cross-examination by plaintiff's counsel as to views differing from his in medical textbooks which such witness does not recognize as authorities, and may such witness be asked on cross-examination to give the names of medical textbooks which disagree with plaintiff's theories?"

After a discussion of the leading cases on the subject in this state, we concluded in that case that, under the facts and circumstances in connection with references to medical textbooks and parts of plaintiff's argument to the jury, a new trial should be granted.

The case at bar presents a somewhat different situation from the one presented in the Briggs case in that in the latter case the expert disagreed at all times with the authorities referred to, whereas in this case, while there was a somewhat reluctant agreement with the authority, there was disagreement with the passage quoted from the authority. We further said in the Briggs case (238 Minn. 494, 57 N. W. [2d] 583):

"There are situations where medical books may properly be used in the cross-examination of medical experts for purposes of impeachment. If a medical expert has undertaken to base his opinions on medical authorities, he may be cross-examined with reference to them. For example, where an expert witness has assumed to base his opinion upon a particular medical book, he may be cross-examined with reference to it, and parts of the book which contradict him may be read into the record. [Citing cases.] This rule may be applied in a situation where the expert has testified that the authorities support his views. In such a case he may be questioned on cross-examination as to whether a medical work, admitted by him to be a standard authority, does not express a contrary view. [Citing cases.]"

In Ruud v. Hendrickson, 176 Minn. 138, 222 N. W. 904, the rule was laid down that it is well settled that medical works are not admissible as substantive evidence for the reason that the authors are not under oath nor subject to cross-examination, but, where a physician testifying as an expert bases his opinion in whole or in part on such works, he may be questioned on cross-examination as to views differing from his in books which he recognizes as authority although it incidentally may place the views of the authors before the jury. Under this rule, the court in the Ruud case permitted the facts to be brought out on cross-examination that the authorities supported the view of the expert testifying and that the expert recognized a particular textbook as an authority, and the court further allowed excerpts to be read from the particular works.

It must be noted from an examination of the record in its entirety with reference to the use of textbooks in a case as close as the one at bar, with the possibility of sympathy entering the case because of the tragic accident, that any irregularity might well have influenced the jury in a prejudicial way as far as defendants were concerned.

There are other assignments of error raised by defendants in connection with the trial court's permitting plaintiff to extensively question police reporter Brachlow concerning a purported privileged and confidential statement and concerning claimed misconduct of plaintiff's counsel in his final argument which we need not discuss in view of our decision that a new trial should be granted.

Reversed and new trial granted.