TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Appellant,

v.

B. F. NIXON, Appellee.

No. 13435.

Court of Civil Appeals of Texas.

Houston.

Oct. 22, 1959.

Rehearing Denied Nov. 19, 1959.

Fulbright, Crooker, Freeman, Bates & Jaworski, Sam H. Hood, Jr., Richard A. Hall, Houston, for appellant.

Wellborn & Britt, Olin G. Wellborn, Jr., Charles W. Britt, Alvin, for appellee.

WERLEIN, Justice.

This is an appeal in a workman's compensation case from a judgment on a jury verdict, for $35 per week for 91 weeks and $25.44 per week for 297 weeks, appellee having previously been paid compensation benefits for 13 weeks at the rate of $35 per week.

Appellant asserts in its first two points that the Court erred in permitting appellee's counsel to read into evidence before

the jury excerpts from a medical textbook, and to cross-examine appellant's expert medical witness by reading from a medical book, which he did not recognize as authoritative.

Appellee's witness, Dr. Ziontz, was asked by appellee whether he was familiar with the book entitled Lesions of The Lumbar Intervertebral Disc, by Dr. R. Glenn Spurling, and several other texts not pertinent hereto. He answered that the book was a "well recognized and well thought of authority in that field." Thereafter, appellee's counsel, over appellant's timely objections, was permitted on cross-examination of Dr. Eggers, to read excerpts from Spurling's book for the purpose, as appellee's counsel stated before the jury, of showing that other reputable doctors and textbooks disagreed with Dr. Eggers' views with respect to certain indications and symptoms of a ruptured disc. Dr. Eggers testified that where there was a ruptured disc on one side the shifting of pain to the other side without leaving pain on the original side indicated there was no ruptured disc; that the pain would not go away entirely. Counsel for appellee then read from said textbook, "As a rule, the pain is unalateral and is constant in the extremity. It is only occasionally bilateral. Very occasionally, it may shift from one limb to the other during the first or successive episodes." When asked whether he agreed with such statement, Dr. Eggers testified, "I disagree. I think it always returns to the original side."

Dr. Eggers, after testifying that pain in the back was not necessarily the first symptom of a lumbar disc, was further questioned whether he agreed or disagreed with the Spurling book which stated, "With very infrequent exceptions the first symptom of a ruptured lumbar disc is pain in the back." He answered, "I don't agree with that." He was then asked whether he agreed that a ruptured intervertebral disc is one of the commonest causes of low back pain and whether one did or did not have radiation of pain down the leg. He answered, "I don't agree with that." Appellee's counsel then read from Spurlings book, "What all of these observations amount to is that a rupture of the intervertebral disc is probably the commonest cause of low lumbar pain with or without sciatic radiation." The doctor, when asked whether he agreed or disagreed with such statement from Dr. Spurling's book, answered, "I don't agree with that."

It is apparent from the record that Dr. Eggers at no time recognized Dr. Spurlings book as authoritative. When interrogated by appellee's counsel concerning it and being advised that it was published in 1953, he stated that the book was probably two years in preparation, making it seven or eight years old, and that in his opinion the findings and progress made and understanding of the intervertebral disc have developed so much since 1953 that he wouldn't accept it or any textbook as being absolutely correct because they would be behind the times. When asked whether he was willing to say that the book in question was not a well-recognized authoritative text on the subject, he merely replied, "No, I did not say that." This was not the equivalent of a recognition of the text as authoritative.

■ It is well established that excerpts from textbooks are inadmissible as direct evidence of the truth of the matters therein asserted. Such evidence would be hearsay. St. Louis, A. & T. Ry. Co. v. Jones, Tex.1890, 14 S.W. 309; Hicks v. Brown, Tex.Civ.App.1939, 128 S.W.2d 884, affirmed in part and reversed in part, 136 Tex. 399, 151 S.W.2d 790; General Life Insurance Co. v. Potter, Tex.Civ.App.1939, 124 S.W. 2d 409, no writ history.

■ Apparently, it is appellee's contention that a medical expert may be cross-examined by reading excerpts from a textbook which the doctor has not recognized as authoritative if some other doctor has testified that the book is authoritative. Ap-

pellee relies largely upon William Cameron Co., Inc. v. Downing, Tex.Civ.App., 147 S.W.2d 963, 968, no writ history, and Hicks v. Brown, supra. In the Downing case the court used this language: "We do not mean to hold that it is impossible to prove the authenticity of such a book. It occurs to us that if proof be made by any competent doctor that same is used and recognized by the medical profession, that this is sufficient." It is not shown in the Downing case whether or not the doctor being cross-examined recognized the book in question as authoritative. If he did, we think the foregoing statement by the court was dictum.

In Hicks v. Brown, supra, the doctor being questioned stated that the medical work in question should be an entirely good authority, being by the Professor of Clinical Medicine of the Jefferson Medical College and that it should be an authoritative statement.

■ We are not unaware of the fact that there is considerable conflict in the authorities and some confusion as to when and under what circumstances a medical book or text can be used in cross-examining a witness. We think the better rule is that a medical witness cannot be cross-examined by reading excerpts to him from a medical book and asking him whether he agrees or disagrees therewith, unless he has either recognized such book as authoritative or has based his opinion in whole or in part thereupon. The purpose of such cross-examination is to impeach the medical witness—to discredit his testimony or test its weight. If the expert medical witness has specifically cited as supporting his opinion certain books or treatises, they may be used in cross-examining him by reading excerpts therefrom inconsistent with the expert's testimony. Also he may be examined upon the basis of treatises which he himself has recognized as having authoritative status, whether or not he has relied thereon in forming his opinion. This, it seems, is the ortho-

dox rule, and the one which we believe is supported by the great weight of authority. Wigmore on Evidence (third edition), 1940, Vol. 6, § 1700, p. 18, states:

"It has been in some Courts held that counsel *on cross-examination*, may, for discrediting purposes, read a passage from a professional treatise as opposing the statement of an expert on the stand, or ask whether a contradictory opinion has been laid down by others. But this is generally repudiated.

"There is here, however, a legitimate use, i. e. where a witness has been allowed to refer to a specific treatise (or to treatises generally) as corroborating him, the treatise may be read to show that it does not contain such corroboration, on the principle (ante, § 1000) of discrediting a witness by showing misstatements on a material point. This orthodox purpose, as expressly distinguished from the indirect introduction of books on their own credit (as above noted), is fully recognized:

"1882, Graves, C. J., in Pinney v. Cahill, 48 Mich. 584, 587, 12 N.W. 862: 'It was not improper to resort to the book, not to prove the facts it contained, but to disprove the statement of the witness and enable the jury to see that the book did not contain what he had ascribed to it.' "

We think the Supreme Court of Texas, in Bowles v. Bourdon, Tex.Civ.App.1949, 219 S.W.2d 779, 783, recognized this orthodox rule in stating:

"When a doctor testifies as an expert relative to injuries or diseases he may be asked to identify a given work as a standard authority on the subject involved; and if he so recognizes it, excerpts therefrom may be read not as original evidence but solely to discredit his testimony or to test its weight. Gulf, C. & S. F. Ry. Co.

v. Farmer, 102 Tex. 235, 115 S.W. 260; Texas & P. Ry. Co. v. Hancock, Tex. Civ.App., 59 S.W.2d 313 (er. ref.)."

Chamberlayne, in his The Modern Law of Evidence, § 2537, p. 3426, makes the following statement:

"Apart from statutory provision, extracts from standard treatises cannot be read to an expert for the sole and direct purpose of contradicting him. There is, however, a valid and well established exception to this general rule. Should the expert, in assigning the grounds for his judgment, state that he bases it, to some material extent, upon the statements of certain textbooks, he may be asked to give in detail who these authorities are, although he is not, necessarily, under any legal obligation to furnish the information. Should the witness conclude, however, to answer, and it appear, upon examination, that these chosen authorities do not sustain the expert in his position, *a fortiori* should they take an antagonistic attitude in the matter, these facts may be shown on rebuttal to discredit the witness."

In Northern Texas Traction Co. v. Bryan, 1927, 299 S.W. 325, 335, the Ft. Worth Court of Civil Appeals, through Chief Justice Conner, stated:

"We are of opinion also that the error assigned to the ruling of the court in not permitting defendant to read from 'Scudder on Fractures' while examining Dr. Johnson should be overruled. Dr. Johnson, in effect, declined to admit that he recognized the work as authority, and that his opinion relating to the injuries to the plaintiff's feet and ankles was based upon his actual experience and knowledge."

See also Galveston, H. & S. A. Ry. Co. v. Hanway, Tex.Civ.App.1900, 57 S.W. 695, 697, in which the court sustained the trial court's ruling in refusing to allow the physician to answer the question con-

cerning what authorities laid down as a rule, on the ground that "The witness had not referred to any book * * * admissible to contradict him or to test his knowledge. Lawson, Exp.Ev. (2d Ed.) p. 215."

See also Texas & P. Ry. Co. v. Hancock, Tex.Civ.App.1933, 59 S.W.2d 313; Lawrence v. Nutter, 4 Cir., 1953, 203 F.2d 540; Zubryski v. Minneapolis Street Railway Co., 1955, 243 Minn. 450, 68 N.W.2d 489; Briggs v. Chicago, Great Western Ry. Co., 1953, 238 Minn. 472, 57 N.W.2d 572; Ullrich v. Chicago City Ry. Co., 1914, 265 Ill. 338, 106 N.E. 828; 58 Amer.Jur., § 846, p. 476; 20 Amer.Jur., § 797, p. 669; 32 C.J.S. Evidence § 575, p. 431; Vol. 13 Minn.Law Review, pp. 732–733.

■ We are of the opinion that it was error to permit the reading of excerpts from Dr. Spurling's book on cross-examination of Dr. Eggers. Appellee contends, however, that if there was such error, which appellee does not admit, such error was harmless under Rule 434, Texas Rules of Civil Procedure.

In the present case the primary questions presented to the jury dealt with the extent and duration of plaintiff's injury and the incapacity resulting therefrom. These issues were closely contested and the medical testimony necessarily played an important part. Appellee's physician, Dr. Ziontz, testified that in his opinion appellee had a probable intervertebral disc injury which caused him nerve root pain on the left side and also absence of sensation in his leg, that a ruptured disc is disabling, that appellee was permanently disabled for heavy work such as the roustabout work he had been doing, and that hard labor would make his condition worse. He further testified as to the pain appellee suffered in his left hip and down his leg, stating that he felt the disc was pressing on a nerve.

Appellant's witness, Dr. Merz, testified that he thought appellee had some minor arthritic changes and disc degeneration, that

the arthritic changes caused all of appellee's difficulty, that appellee could resume light work and would recover in time, that he was sure that appellee had no ruptured disc, that it was his opinion that appellee probably had a severe backache and sprained muscle in the back, and possibly some of the little muscles were torn from their insertions in the backbone with some swelling resulting in some nerve pressure pain.

Dr. Eggers testified that appellee complained of pain in his right leg and groin area on the right side and did not complain of pain in the left leg; that the pain complained of "was located in the back, the small of the back, and the buttocks area. Not in the legs"; that when he saw appellee about May 5, 1958, his chief complaint was pain in his back and left leg, and that the pain had shifted from his right leg to the left leg; that from the type of pain he had and the fact that he did not have any indication in the disc region, and from the appearance of the X-rays, and all of the facts combined, he felt appellee had an early arthritic condition in his back, causing irritation and some disability because of the discomfort he was having; that a change of his activity improved his right side, and that his left side had also improved; that he felt appellee would be 85% effective in his work; that it was fundamentally an arthritic condition that was giving rise to his referred pain as distinguished from a ruptured disc, and that in his opinion he did not have a ruptured disc; that the symptoms just did not fit a ruptured disc; that if you have a true ruptured intervertebral disc the pain won't shift over that way (from his right hip area to the left side), that the pain would stay where the nerve is being pressed on; that in arthritic cases the pain will shift back and forth, though the shifting was not necessarily a finding; that he thought appellee would recover from the onset of pain that he had and that he would be able to go back to work but would have to decrease in his weight lifting and things like that for some

time, and that is why he allowed a premanent partial disability; that he thought appellee could do any kind of work as long as he watched excessive weight lifting; that the symptom of the shifting pain indicated that there was not a ruptured intervertebral disc.

It is thus seen that the issue of whether appellee had suffered a ruptured disc or had merely an arthritic condition and some disc degeneration, possibly aggravated by the accident, was closely contested. In this setting there can be little question but that the jury was influenced by the medical evidence in finding total incapacity for 104 weeks, and a permanent decrease of $42.40 in appellee's average weekly earning capacity. Appellant's witnesses testified in effect that appellee would recover; that he did not have a ruptured disc, that the symptoms with respect to pain were not those found in the case of a ruptured disc. On the other hand, appellee's physician testified that his diagnosis was a probable ruptured disc and that appellee's incapacity was permanent. Appellee then was permitted to read in evidence statements from Dr. Spurling's book which Dr. Eggers had not recognized as authoritative and with which he did not agree. We think it only natural and probable that the jury was influenced by the reading of these excerpts from a text which Dr. Ziontz had testified was a well recognized and well thought of authority and that thereby the testimony of Dr. Eggers, appellant's only orthopedic surgeon and specialist, was discredited or the weight thereof lessened. True, the statements from the textbook were not introduced as primary evidence, but the practical effect thereof was to get before the jury the unsworn testimony of another doctor, or medical source. Indeed, counsel for appellee stated before the jury that the purpose of reading the excerpts was to show what "other reputable doctors and textbooks believe  *  *  *."

The importance and probable effect of this improper evidence was recognized by

appellee's counsel in his argument when he stated:

"Now, he says that Dr. Eggers didn't think much of this book I was asking him about. Dr. Eggers says, 'Oh, printed in 1953.' Do you remember? I asked Dr. Eggers, 'Doctor, can you give me the name of any other book on the ruptured disc that has been published since then?' He couldn't think of a single one. And do you know why, because there aren't any. I don't know whether that books knows everything, but I also know that Dr. Eggers didn't invent the principals of medicine."

Counsel for appellee, further argued:

"B. F. Nixon has either got a ruptured disc, or at least something a lot more serious than just arthritus, or he has got nothing. I think that is your only choice. I think that is your only choice. I will tell you right now, if you believe in your heart that there is nothing more wrong with B. F. Nixon than the arthritus that Dr. Eggers told you about, then, I want you to go in that Jury room and I want you to answer these questions just like Sam Hood told you to answer them. Because, if you believe that, we are not entitled to one minute of your time and consideration."

Judging from the amount of compensation awarded by the jury, and the credence usually given a textbook, and further in view of the argument of counsel that appellee was not entitled to any consideration if the jury believed that he had nothing more wrong with him than the arthritis that Dr. Eggers told them about, it seems probable that the jury felt that the testimony of Dr. Eggers, who disagreed with Dr Spurling's book, was unreliable or in error, and therefore that appellee did in fact have a ruptured disc and incapacity to labor resulting therefrom.

We have concluded after careful consideration of all the evidence that the error in reading excerpts from Dr. Spurling's book was prejudicial; that it was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case. We have found no Texas case directly in point. See, however, Allen v. Boston Elevated Ry. Co., 1912, 212 Mass. 191, 98 N.E. 618, 619, 41 L.R.A.,N.S., 1219, in which the court in reversing the case, stated:

"As in Kaler v. Builders' Ins. Co., 120 Mass. 333, 355, 'the effect and as may reasonably be supposed the purpose' of counsel were to bring before the jury the opinions of others who were, it was suggested, persons skilled in such matters, and to lessen the weight of the witness's testimony by showing that their views were different from his."

See also Briggs v. Chicago, Great Western Ry. Co., supra; De Haan v. Winter, 1933, 262 Mich. 192, 247 N.W. 151; Farmers Union Federated Cooperative Shipping Association v. McChesney, 8 Cir., 1958, 251 F.2d 441.

In view of our holding, it is not necessary to pass upon appellant's third Point questioning the sufficiency of the evidence to establish appellee's total incapacity for 104 weeks, and we refrain from so doing since the evidence may not be the same on another trial.

The judgment of the Trial Court is reversed and the cause is remanded.