**Jerome CORNFELDT, as Trustee for the Next of Kin of Phyllis Cornfeldt, Deceased, Appellant,**

v.

**Lyle TONGEN, Respondent,**

**Ronald Beals, et al., Respondents,**

**Robert C. Knutson, Respondent,**

**Ayerst Laboratories, Incorporated, Respondent.**

**No. 46074.**

Supreme Court of Minnesota.

Dec. 30, 1977.

Robins, Davis & Lyons, Solly Robins, John F. Eisberg and Robert M. Wattson, St. Paul, for appellant.

Richards, Montgomery, Cobb & Bassford, Charles A. Bassford and Robert Merrill Rosenberg, Minneapolis, for Tongen.

Altman, Geraghty, Mulally & Weiss, James W. Kenney and James R. Gowling, St. Paul, for Beals, et al.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, and O. C. Adamson II, Minneapolis, for Knutson.

Lasley, Gaughan, Reid & Stich and Douglas Dale Reid, Jr., Minneapolis, for Ayerst.

KELLY, Justice.

Plaintiff appeals from an order of the district court denying his motion for a new trial or, in the alternative, judgment notwithstanding the verdict, and from the judgment for defendants. We affirm in part, reverse in part, and remand for a new trial.

This is an action for wrongful death, charging medical malpractice in the care and treatment of Mrs. Phyllis Cornfeldt, plaintiff's decedent. The basic facts are undisputed. Late in the evening of June 24, 1973, Mrs. Cornfeldt, complaining of severe abdominal pain, entered Miller Hospital in St. Paul. Dr. Ronald Beals, a first-

year surgical resident, examined her, ordered tests and X-rays, and determined that she was suffering from a perforated ulcer requiring emergency surgery. Mr. and Mrs. Cornfeldt did not know any surgeons, but selected Dr. Lyle Tongen from a list of surgeons offered by Dr. Beals. Dr. Tongen was called; he came to the hospital, examined Mrs. Cornfeldt, and confirmed Dr. Beals' diagnosis. Shortly thereafter, he operated on Mrs. Cornfeldt, assisted by Dr. Beals, and discovered a hole in the forward wall of the stomach. Because the cells surrounding the hole looked abnormal, Dr. Tongen called in a pathologist from the hospital to do a frozen-section analysis of the suspicious tissue, which was excised along with the ulcer. That analysis proved benign so the incision was closed. Mrs. Cornfeldt's recovery was smooth and uncomplicated, and she was discharged from the hospital on July 2. No negligence in the performance of this operation is alleged.

On July 16, 1973, her fiftieth birthday, Mrs. Cornfeldt went to Dr. Tongen for a postoperative checkup and learned that he recommended a second operation, a gastrectomy which would involve removal of a substantial portion of her stomach. An analysis by the pathology department of the hospital of a paraffin section had revealed that the suspicious cells removed during the earlier operation were "atypical." A slide of the tissue then had been sent to a professor of pathology at the University of Minnesota who determined that cancer was present. A gastrectomy was the only effective treatment to prevent the risk that the cancer might spread and to be effective it had to be done with reasonable dispatch. Cancer of the stomach is a very serious disease with a high mortality rate.

Mrs. Cornfeldt entered Miller Hospital on the afternoon of July 23, 1973. The gas-trectomy was scheduled for the following morning. Routine laboratory tests were performed, and Dr. Beals examined her and recorded her history. Mrs. Cornfeldt appeared to be in excellent health and was clinically without symptoms. The results of the laboratory tests were recorded on her chart by the next morning. They were normal except in two pertinent respects: (1) On the SMA–12 graph (a battery of 12 tests of the blood), the alkaline phosphatase reading was 145, compared with a normal range of 30 to 85; and (2) the SGOT reading (which measures the level of serum glutamic-oxaloacetic transaminase) was "off the chart," with a reading above 250, compared with a normal range of 10 to 50. These tests are not in themselves specifically diagnostic, since they indicate increased levels of enzymes in the blood that may be caused by several organs.[1] Additional tests were readily available, however, to pinpoint the diagnosis.[2]

Dr. Robert C. Knutson, anesthesiologist for the operation, noted the abnormal readings and presumed that the cancer had already spread to Mrs. Cornfeldt's liver. He interviewed Mrs. Cornfeldt thereafter, but did not discuss the results with her or with anyone else. She told him that she had been happy with the anesthetic used for her first operation—a combination of drugs whose principal agent was Fluothane[3]—and Dr. Knutson decided to use this same anesthetic for the gastrectomy.

Dr. Tongen, the surgeon for the forthcoming operation, also noted the abnormal test results, but thought they were attributable to a spread of the cancer or to a mild postoperative peritonitis from the first operation. In any event, because of Mrs. Cornfeldt's excellent clinical condition and the relative urgency of the operation, he decided to proceed with the operation with-

---

1. An elevated alkaline phosphatase level indicates the possibility of either liver or bone disease. A rise in the level of SGOT may be indicative of liver, heart, or muscle damage.

2. These included refinements of the SGOT and alkaline phosphatase tests, additional enzyme tests, measurement of the bile in the urine, a test of the blood's capacity to clot (prothrombin test), and a differential blood count.

3. Fluothane is the trade name for the anesthetic; halothane is its generic name. It is a widely used and nearly ideal anesthetic agent.

out ordering further tests and without discussing the results with Mrs. Cornfeldt or anyone else. He asked Dr. Beals to assist him during the operation. Dr. Beals did not recall looking at the test results before the operation; he did speak with Mrs. Cornfeldt the morning of the operation and she informed him then that her urine was as dark as beer but he did not record this on her chart.

The gastrectomy proceeded without incident, Dr. Tongen first making a small incision to conduct a superficial examination of the liver. He found no evidence of cancer there or elsewhere when he proceeded with the 3-hour operation. Mrs. Cornfeldt's recovery appeared to be going well, but after a few days jaundice was evident in her eyes and skin. By July 31, after a series of tests performed the day before, it was clear that her liver was seriously malfunctioning, and Dr. Alfonzo A. Belsito, a gastroenterologist specializing in liver disorders, was called in. On August 1, Mrs. Cornfeldt was transferred to University of Minnesota Hospitals, where desperate measures, including a liver transplant, were unsuccessfully taken. Mrs. Cornfeldt died from hepatitis on September 20, 1973.[4] Had the surgery been postponed, there was an 85 to 90 percent probability she would have recovered from hepatitis in a month or six weeks.

Plaintiff commenced this action against Dr. Tongen; Dr. Knutson; Dr. Beals; United Hospitals, Miller Division; and Ayerst Laboratories, Inc., the manufacturer of Fluothane. He alleged that Dr. Tongen, Dr. Knutson, and Dr. Beals were negligent in proceeding with the gastrectomy despite the two abnormal test results without further testing and that, if the operation should have proceeded, Dr. Knutson was negligent in his selection of Fluothane as one of the anesthetics. Plaintiff further alleged that these defendants were negligent in failing to consult with a specialist about the test results and in failing to inform Mrs. Cornfeldt of the increased risk of the operation such results foretold. He also alleged that Ayerst Laboratories was negligent in failing to provide an adequate warning for Fluothane and thus its product was defective. At the close of plaintiff's case, the trial judge granted motions for directed verdicts by Dr. Beals, United Hospitals, Miller Division, and Ayerst Laboratories. The jury returned a verdict for Dr. Tongen and Dr. Knutson.

This appeal arises from a long and difficult trial. Plaintiff has raised some 14 issues for our consideration. We conclude that the court erred in excluding certain expert evidence of the impropriety of Dr. Tongen's conduct. We conclude also that the court erred in refusing to instruct the jury on the duty of Dr. Tongen and Dr. Knutson to secure Mrs. Cornfeldt's informed consent to the operation. A prejudicial error also limited evidence of plaintiff's damages. We therefore reverse and remand for a new trial on Dr. Tongen's negligence, the issue of informed consent, and plaintiff's damages. With respect to the other defendants and Dr. Knutson's alleged negligence, we affirm the judgment of the court below. Those issues necessary to explain our decision and those that may be germane to retrial provide the framework for our discussion:

(1) Did the trial court abuse its discretion in determining that Dr. Belsito, Dr. Burke, Dr. Beals, and Donald Keith, the chief nurse anesthetist at Miller Hospital lacked the qualifications to render the expert medical opinions asked of them?

(2) Did the trial court err in refusing to instruct the jury on testimony received in evidence when a part of the testimony of the witness was stricken and that testimony was so intertwined with the received testimony that a substantial likelihood of jury confusion existed as to the evidence admitted?

---

4. An autopsy failed to reveal evidence of cancer anywhere in her body. Nor was any cancer found in that part of her stomach removed in the gastrectomy. These findings, however, are not conclusive as to the absence of cancer. Moreover, they are immaterial since, in light of the pathologist's diagnosis of cancer after the first operation, a gastrectomy is the medically accepted procedure for treatment.

(3) Did the trial court abuse its discretion in restricting the testimony of Dr. G. T. Wier and Dr. John S. Najarian because plaintiff failed to disclose their identity as expert witnesses during the discovery process?

(4) Did the trial court properly refuse to instruct the jury on Dr. Tongen's duty to consult a liver specialist?

(5) Did the trial court properly refuse to instruct the jury on informed consent?

(6) Did the trial court err in excluding decedent's hospital record which contained a diagnosis of halothane hepatitis?

(7) Did the trial court err in admitting a Fluothane "stuffer sheet" issued by Ayerst Laboratories in 1975 which did not contain a warning included in an earlier "stuffer sheet" that the anesthetic should not be used in cases involving liver dysfunction?

(8) Did the trial court err in excluding the hospital accreditation manual in force at the time of Mrs. Cornfeldt's operation?

(9) Did the trial court err in holding as a matter of law that the pecuniary loss caused by Mrs. Cornfeldt's death could be measured by no more than a 40-hour work week?

(10) Did the trial court properly grant a directed verdict for Dr. Beals and United Hospitals, Miller Division, and for Ayerst Laboratories, Inc.?

(11) Did the trial court err in granting defendants more than two peremptory jury challenges?

**1–2.** In a medical malpractice action, the plaintiff ordinarily must offer expert testimony to establish the standard of care and the defendant's departure from that standard. *Todd v. Eitel Hospital*, 306 Minn. 254, 257, 237 N.W.2d 357, 359 (1975); *Swanson v. Chatterton*, 281 Minn. 129, 134, 160 N.W.2d 662, 666 (1968). The expert testimony plaintiff advanced was restricted in part by the trial court on two grounds: (1) Lack of foundation to render an expert opinion, and (2) limitations derived from the discovery process.

The competence of a witness to testify on a particular matter is a question of fact peculiarly within the province of the trial judge, whose ruling will not be reversed unless it is based on an erroneous view of the law or clearly not justified by the evidence. *Hagen v. Swenson*, 306 Minn. 527, 236 N.W.2d 161 (1975); *Swanson v. Chatterton, supra.* With respect to medical witnesses, we have required both sufficient scientific knowledge of and some practical experience with the subject matter of the offered testimony. In *Swanson v. Chatterton*, 281 Minn. 129, 136, 160 N.W.2d 662, 667, we upheld the exclusion of testimony of an internist as to the standard of care required of an orthopedic surgeon in treatment of an arm fracture where the internist had "had no substantial experience or expertise in the direct care of orthopedic patients." The court quoted approvingly (281 Minn. 138, 160 N.W.2d 668) from *Pearce v. Linde*, 113 Cal.App.2d 627, 629, 248 P.2d 506, 508 (1952):

" 'The definitive criteria in guidance of the trial court's determination of the qualifications of an expert witness are recognized in *Sinz v. Owens, supra*, 33 Cal.2d 749, at page 753, 205 P.2d 3, to rest primarily on "occupational experience," as stated [at page 753, 205 P.2d at page 5]: "The proof of that standard (the reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances) is made by the testimony of a physician qualified to speak as an expert and having in addition, what Wigmore has classified as 'occupational experience—the kind which is obtained casually and incidentally, yet steadily and adequately, in the course of some occupation or livelihood.' (2 Wigmore on Evidence [3d ed.] Sec. 556, p. 635.) He must have had basic education and professional training as a general foundation for his testimony, but it is a practical knowledge of what is usually and customarily done by physicians under circumstances similar to those which confronted the defendant charged with malpractice that is of controlling importance in determining com-

petency of the expert to testify to the degree of care against which the treatment given is to be measured." ' "[5]

Application of these principles to the present case requires a review of each witness' background and the particular matter to which his testimony would have related.

■ *Dr. Alfonzo A. Belsito.* Dr. Belsito, a specialist in internal medicine and gastroenterology and an author of articles in his field of practice, was one of the expert witnesses advanced by plaintiff. Since 1967 he has been in private practice, 10 to 15 percent involving the diagnosis and treatment of liver disease. He has been consulted by surgeons regarding the suitability for surgery of patients suspected of having liver conditions, and a factor in such decisions has been the effect of the anesthetic on the patient. He also was familiar with the standards of practice relating to the preoperative care of a patient about to undergo a gastrectomy.

Plaintiff ultimately attempted to elicit from Dr. Belsito his opinion regarding accepted medical practice and whether it was a deviation therefrom for Dr. Tongen to proceed with the operation and for Dr. Knutson to administer Fluothane. Objections to these questions were sustained on the ground that plaintiff had failed to demonstrate that Dr. Belsito was properly qualified to render such opinions. Plaintiff made an offer of proof indicating that Dr. Belsito would have testified that the actions of Dr. Tongen and Dr. Knutson did not conform to accepted medical practice.

The trial court abused its discretion in excluding Dr. Belsito's testimony concerning the conduct of the surgeon, Dr. Tongen. Dr. Belsito had gained sufficient practical experience from his consultations regarding the suitability of patients for surgery. In this respect his background is distinguishable from the internist whose testimony was excluded in *Swanson v. Chatterton, supra.*

5. California has extended the requirement of occupational experience to require that the expert witness personally have performed the medical procedure in question, unless it is a rare technique. *Dow v. Kaiser Foundation,* 12

In *Swanson,* the medical expert was not familiar with either the accepted authorities or the scientific writings regarding the treatment at issue, and had no substantial experience in the direct care of orthopedic patients; his knowledge of the field was based mainly on what he had learned some 15 years earlier in medical school.

In *Lieder v. Maus,* 295 Minn. 173, 203 N.W.2d 393 (1973), the court reversed because the exclusion of testimony concerning the proper treatment of a wrist fracture was an abuse of discretion. The proffered witness in Lieder was a physician who had actually set and treated such fractures. Dr. Belsito had never practiced general surgery nor did he purport to possess expertise in the field of surgery. Yet it was error to require that Dr. Belsito have such a background. First, no question was raised as to the competence of the surgery that was performed. The alleged negligence concerned only the suitability of Mrs. Cornfeldt for surgery in light of the preoperative tests. Second, even though the decision to operate was a matter of judgment, i. e., balancing the risks of the operation against the risk of delay in treating the cancer, there is no apparent reason to prevent anyone but a surgeon from testifying as to accepted medical practice in that situation. As the court stated in *Christy v. Saliterman,* 288 Minn. 144, 167, 179 N.W.2d 288, 303 (1970):

" * * * [O]pinion evidence is not restricted to the testimony of the person best qualified to give an opinion or even to some of the few persons best qualified. One may be competent to testify as an expert although he is not shown to be highly qualified to speak upon the subject or is not at the top of his profession. It is usually held that any person whose profession or vocation deals with the subject at hand is entitled to be heard as an expert, while the value of his evidence is to be tested by cross-examination and ultimately determined by the jury."

Cal.App.3d 488, 498, 90 Cal.Rptr. 747, 752 (1970); Annotation, 46 A.L.R.3d 275, 279. Other states recognizing the requirement have not extended it to such length. Id. at p. 282.

Accord, *Hagen v. Swenson*, 306 Minn. 527, 236 N.W.2d 161 (1975); *Frost v. Mayo Clinic*, 304 F.Supp. 285 (D.Minn.1969). Indeed, the court specifically noted in *Swanson v. Chatterton*, 281 Minn. 129, 137, 160 N.W.2d 662, 667, that "the trial court made clear that it was not excluding the testimony merely because the witness was not a specialist in orthopedic surgery." That would be the effect of the trial court's ruling here. Therefore, it was clear error to exclude Dr. Belsito's opinion with respect to accepted surgical practice.

The trial court did not err, however, in excluding Dr. Belsito's testimony with respect to Dr. Knutson, the anesthesiologist. Although Dr. Belsito employed local anesthetics in his practice and knew of the effect of anesthetics on the liver, no evidence appeared demonstrating that he had sufficient knowledge to differentiate general anesthetics or that he had ever consulted with an anesthesiologist regarding the use of a general anesthetic. In these circumstances, the trial court did not abuse its discretion in excluding this testimony of Dr. Belsito.

*Dr. Michael Burke.* Plaintiff also called Dr. Michael Burke, associate pathologist at Mount Sinai Hospital, who testified that it was a deviation from medical standards for the anesthesiologist, surgeon, and surgical resident to have proceeded as they did. At the end of plaintiff's case, part of this testimony was stricken on defendants' motions for lack of foundation. The trial court refused to strike either Dr. Burke's testimony describing the medical practices of surgeons and anesthesiologists relative to their responsibilities in reading the SMA–12 results and ordering further tests or his opinion that an anesthesiologist should have realized that liver damage was likely to result in Mrs. Cornfeldt's case.

■ Specifically, the trial court excluded Dr. Burke's testimony that in giving general anesthesia the anesthesiologist deviated from accepted medical practice. The grounds justifying this ruling were present in the evidence. Dr. Burke had had little training in anesthesiology (only his medical school general background), and he did not claim any real expertise in knowing when combinations of anesthetics should or should not be given to patients. Furthermore, his occupational experience with anesthesiology was limited to discussions with the anesthesiologists at Mount Sinai Hospital and meetings of his pathological society. The trial judge thus might reasonably have concluded that Dr. Burke lacked the expertise to give an opinion that it was a deviation from accepted medical practice for Dr. Knutson to have administered a general anesthetic to Mrs. Cornfeldt.

■ The trial court also excluded Dr. Burke's testimony that it was a deviation from medical standards for Dr. Tongen not to have postponed surgery until further tests had been run. The court reasoned that Dr. Burke had never done any surgery and that the proper treatment of cancer is left to the surgeon's judgment. Such justifications are clearly insufficient, but a different ground sustains the court's discretion to exclude the testimony. Like Dr. Belsito, Dr. Burke assisted surgeons in diagnosing illnesses by reviewing charts and tests. But unlike Dr. Belsito, no evidence demonstrated that Dr. Burke had knowledge of the accepted medical practice of surgeons in evaluating the *suitability* of patients for surgery. Without such evidence, the exclusion of his testimony that the surgery should not have proceeded was not clearly wrong.

Dr. Burke also testified that accepted medical practice required the surgical resident, Dr. Beals, to review and interpret the SMA–12 test results. The exclusion of this testimony was grounded on Dr. Burke's ignorance of the requirements of a surgical residency and the stage of Dr. Beals' residency. Plaintiff argues that such knowledge is immaterial to the formation of an opinion concerning Dr. Beals' conduct, since Dr. Beals should be held to the standard of a licensed practicing physician (which he was), and as such he had a duty to review the preoperative test results before assisting at surgery.

*Moeller v. Hauser*, 237 Minn. 368, 375, 54 N.W.2d 639, 644 (1952), supports the principle that a resident should be charged with the skill and learning of a physician in good standing and the application of that expertise with due care. But that principle does not of itself define a resident's duties; it suggests only that a resident must skillfully perform the duties entrusted to him.[6] The duties entrusted to a resident include those that are delegated to a resident in his field under accepted medical practice and those he assumes in various circumstances. Dr. Beals' uncontradicted testimony defined his duties as follows: "We would see patients and do history and physical examinations on them; we would assist the surgeon in surgery, and attend conferences and do basically whatever the surgeon bade us to do." He also ordered diagnostic tests, which would be made available for the attending staff physicians, and prescribed drugs for patients. But he testified that he reviewed preoperative test results only if time permitted. In addition, there was much testimony that it is for the surgeon to decide if the operation is to proceed. From the evidence, therefore, it appears that although it is accepted medical practice for a first-year surgical resident to perform various duties in the diagnosis and treatment of patients, the responsibility of reviewing preoperative test results is not among them. Moreover, even if this were a duty which Dr. Beals negligently omitted to perform, plaintiff has suffered no harm in the exclusion of this testimony because there is no causal relationship between that omission and the injury: Dr. Tongen, the surgeon in charge of the operation, testified that he was aware of the test results and that he could not conceive of a situation or a test that would have caused him to abandon the surgery. Dr. Beals stated in a deposition,

included in an offer of proof, that he would have acceded to whatever Dr. Tongen decided.

The court instructed the jury to disregard those portions of Dr. Burke's testimony that it had excluded from the evidence, but denied plaintiff's request that it inform the jury as to which of the opinions of Dr. Burke had been received. Plaintiff argues that the trial court should have informed the jury of the opinions received since they were intertwined with the evidence specifically stricken. Plaintiff's argument is that if it was a deviation from medical practice to fail to order further tests, then it must have been a deviation to proceed with surgery, and thus striking evidence of the latter is equivalent to striking evidence of the former, unless the jury was specifically instructed otherwise. Although plaintiff's argument is not logically compelling,[7] there was a substantial likelihood that the jury would have been confused, absent further instruction, about Dr. Burke's testimony with respect to Dr. Tongen's conduct. Thus, it was error to fail to so instruct the jury. Because of the improper exclusion of Dr. Belsito's testimony, we do not predicate reversal on this ground alone.

*Dr. Ronald Beals.* Plaintiff also called defendant Dr. Beals and certain parts of his testimony were excluded. Specifically, plaintiff sought to ask Dr. Beals if the abnormal preoperative test results would be a warning or flag to himself or the surgeon and in that light whether he would have consulted with Dr. Tongen and Dr. Knutson about the need for further tests to determine Mrs. Cornfeldt's suitability for surgery. The court ruled that such questions called for speculation from Dr. Beals and that he was not an expert in the field of

---

6. The resident in the *Moeller* case was negligent in not preventing a pressure sore from arising from traction of a broken leg. Since this is akin to postoperative care, a matter traditionally delegated in large part to residents and interns, the case does not reach the issue in question here. See, Hayt, Hayt & Groeschel, Law of Hospital, Physician, and Patient (2 ed.) p. 409.

7. Plaintiff's syllogism fails because of the possibility that it might have been accepted medical practice for the surgeon to proceed with the operation in these circumstances (i. e., treatment of cancer in a patient in excellent clinical condition) despite the fact that further test results might have indicated Mrs. Cornfeldt had hepatitis.

hematology, anesthesiology, or surgery, and hence not qualified to evaluate the tests. The evidence indicates that Dr. Beals had sufficient expertise to evaluate the test results at least to the extent they served as a warning, even assuming his lack of expertise in the enumerated specialties. In medical school he had taken a clinical pathology course which dealt with the evaluation of test results. Moreover, he ordered tests to aid in the diagnosis of Mrs. Cornfeldt's postoperative jaundiced condition and, on the basis of the results and literature he had researched, prescribed a drug for her treatment. From this activity, it must be presumed he could evaluate the tests at least to the extent of recognizing a warning signal in an abnormal reading so as to be competent to testify. The weight given his testimony is a matter for the jury. Nor does Dr. Beals' testimony as to what he would have done seem speculative, especially in a case charging negligent omission. Yet to that extent the exclusion was harmless error because, as discussed earlier, there was no causal relationship between Dr. Beals' actions and Mrs. Cornfeldt's injuries, Dr. Tongen being a superseding cause.

 We think that Dr. Beals, as a surgical resident who had practiced at Miller Hospital for 10 months, had sufficient qualifications to render an expert opinion as to whether the preoperative test results would constitute a warning to a surgeon under accepted medical practice. Defendants contend, however, and the trial court ruled, that one defendant could not be examined as an adverse witness concerning whether the conduct of a codefendant conformed to accepted medical practice.

In *Anderson v. Florence,* 288 Minn. 351, 181 N.W.2d 873 (1970), and *Larson v. Belzer Clinic,* 292 Minn. 301, 195 N.W.2d 416 (1972), this court established that a defendant as an adverse witness cannot refrain from giving an expert opinion as to whether *his* conduct conformed to accepted medical practice. No Minnesota decision reaches the question at issue, but a court of appeals in the state of Washington stated, with respect to compelling answers to questions asked in depositions:

"The defendants here need not answer purely hypothetical questions nor must they give an opinion that would be pure conjecture; but questions which relate to the treatment given or not given to Mrs. May are proper inquiry and they must be answered without regard to whether they call for an expert opinion on the conduct of the defendant questioned *or any other defendant.* Medical opinion formed at the time the patient was treated is a proper subject for inquiry." *Estate of May v. Zorman,* 5 Wash.App. 368, 371, 487 P.2d 270, 272 (1971). (Italics supplied.)

Since modern medicine is generally practiced by teams of physicians or surgeons, restricting a defendant's expert opinion to his own actions might well abrogate the rule adopted in *Anderson,* because testimony about the defendant's own conduct may involve reference to another defendant's actions. Moreover, no cogent reason appears sustaining the restriction of the testimony of a defendant who has sufficient expertise to render an opinion against a codefendant.[8] Cf. *Larson v. Belzer Clinic,* 292 Minn. 301, 305, 195 N.W.2d 416, 418 (1972). As the court emphasized in *Anderson v. Florence,* "[I]t is now generally recognized that the purpose of the adverse-party-witness rule 'is to permit the production in each case of all pertinent and relevant evidence that is available from the parties to the action.'" 288 Minn. 361, 181 N.W.2d 879. It therefore was error to exclude this portion of Dr. Beals' testimony, and this error is another factor in our reversal of the judgment for Dr. Tongen.

 *Donald Keith.* The trial court ruled that Donald Keith, chief nurse anesthetist at Miller Hospital, could render no expert opinions relative to the use of anes-

---

**8.** If it is thought that forcing an expert opinion from a defendant is the taking of property without just compensation, such difficulty could be eliminated by the allowance of expert witness fees pursuant to Minn.St. 357.25. *Anderson v. Florence,* 288 Minn. 351, 357, 181 N.W.2d 873, 877 (1970).

thesia in Mrs. Cornfeldt's operation. Apparently, the basis of the court's ruling was that Keith was not licensed to practice medicine in this or any other state. This court rejected that basis as a proper ground for exclusion. In *Hagen v. Swenson,* 306 Minn. 527, 528, 236 N.W.2d 161, 162 (1975), the court noted, in permitting an expert witness who was a neurologist and psychiatrist to interpret a Minnesota Multiphasic Personality Inventory, that "licensing statutes * * * have no direct application to the qualifications of expert witnesses." Accord, *Christy v. Saliterman,* 288 Minn. 144, 167, 179 N.W.2d 288, 302 (1970) (psychiatrist, not board certified, permitted to testify); *Palmer v. Order of United Commercial Travelers,* 191 Minn. 204, 205, 253 N.W. 543, 544 (1934) (coroner, not a doctor, permitted to testify as to the cause of death); *Berkholz v. Benepe,* 153 Minn. 335, 338, 190 N.W. 800, 801 (1922) (graduate of medical school, unlicensed in the state in defendant's therapeutic system of medicine, permitted to testify). Thus, Keith was not disqualified from testifying solely because he was not a licensed physician or because he did not graduate from medical school and had received only the training of a registered nurse anesthetist. If Keith otherwise had sufficient scientific and practical experience about the matter to which he would have testified, he would have been a competent expert witness. Therefore, the trial court erred in excluding Keith's testimony on that basis.

Plaintiff, however, intended to ask Keith *his* opinion as to whether the anesthetic administered to Mrs. Cornfeldt was appropriate in the circumstances. The procedure Keith would have followed is immaterial to the issue of whether defendant's actions conformed to accepted medical practice. See, *Hoffman v. Naslund,* 274 Minn. 521, 531, 144 N.W.2d 580, 589 (1966), overruled on other grounds by *Anderson v. Florence,* 288 Minn. 351, 181 N.W.2d 873. Thus, the exclusion was not prejudicial and no reversible error arises from the court's ruling. E. g., *Electric Service Co. v. Lakehead Electric Co.,* 291 Minn. 22, 26, 189 N.W.2d 489, 492 (1971).

3. Plaintiff also contends that the trial court abused its discretion in restricting the testimony of two expert medical witnesses, Dr. G. T. Wier and Dr. John S. Najarian, because their identities as expert witnesses had not been revealed during the discovery process. Although we find that neither ruling, if erroneous, was prejudicial, we caution trial courts from readily excluding expert testimony in malpractice cases for inadvertent failure to disclose that testimony during discovery. Exclusion is justified only when prejudice would result. *Dorn v. Home Farmers Mut. Ins. Assn.,* 300 Minn. 414, 419, 220 N.W.2d 503, 506 (1974). When the failure to disclose was not willful, courts should consider alternative methods short of exclusion for preventing prejudice, e. g., granting a continuance and assessing costs against the offending party, *Krech v. Erdman,* 305 Minn. 215, 218, 233 N.W.2d 555, 557 (1975); or limiting the subject matter of the testimony to matters already disclosed, *Phelps v. Blomberg Roseville Clinic,* Minn., 253 N.W.2d 390 (1977). See, also, *Boland v. Garber,* Minn., 257 N.W.2d 384 (1977); *Shymanski v. Nash,* Minn., 251 N.W.2d 854 (1977). It must not be forgotten during our efforts to ensure compliance with discovery rules that the judicial process is an attempt to seek the truth. We should not unduly hamper that search by excluding relevant evidence where other means are available to protect a party from the effects of an inadvertent failure to disclose. Trial courts must have discretion to determine the sanction appropriate to a violation of the discovery rules, for they are in the best position to assess the degree of prejudice that will arise from the violation and the efficacy of the remedies available that may prevent prejudice from resulting. But where the testimony of an expert is necessary to establish the proponent's cause, as in a malpractice case, and where the failure to disclose was inadvertent, perhaps because of the expert's reluctance to testify against his colleagues, the exercise of that discretion should be tempered by an effort to seek a solution short of exclusion that will accommodate the competing inter-

ests inherent in the discovery rules and the adjudicative process itself.

■ Lack of proximate causation prevents the exclusion of Dr. Wier's testimony against Ayerst Laboratories from being prejudicial error. Dr. Wier, an anesthesiologist, would have testified that "the warning was inadequate [in] that it did not advise anesthesiologists that if Halothane was to be administered on successive occasions within a thirty to ninety day period of time that [they] should * * * perform certain liver tests in order to rule out whether or not there has been a hypersensitivity reaction to Halothane on the first administration." In *Mulder v. Parke Davis & Co.,* 288 Minn. 332, 335, 181 N.W.2d 882, 885 (1970), the court stated that "where the only issue is failure to communicate a warning, the manufacturer is not liable if the doctor was fully aware of the facts which were the subject of the warning." Dr. Knutson was aware of the basis of Dr. Wier's allegations at the time of the surgery but discounted them from his own knowledge and experience.[9] An anesthesia "stuffer sheet" can provide only general warnings and recommendations and not prescribe the particular procedure desirable in an individual case. It appears that Dr. Knutson made his decision in Mrs. Cornfeldt's case on the basis of the facts that would have to come to his attention had the "stuffer sheet" read as plaintiff alleged it should have. Therefore, the claimed deficiency in the warning was not a cause of Mrs. Cornfeldt's injuries, and the exclusion of Dr. Wier's testimony was not prejudicial error. Because this was the only claim of error raised by plaintiff in connection with the directed verdict for Ayerst Laboratories, we affirm the judgment in that respect.

The trial court also restricted the testimony of Dr. John S. Najarian, a renowned surgeon, ruling that he could not testify against Dr. Tongen, because of plaintiff's failure to apprise Dr. Tongen of the testimony. This ruling could not be prejudicial because Dr. Najarian stated in a subsequent affidavit that he would have testified that "surgery should have progressed as early as practical not withstanding the SGOT and alkaline phosphatase tests in light of the diagnosis of cancer of the stomach."

■ 4. Plaintiff next contends that the trial court erred in refusing to instruct on consultation. A party is entitled to a specific instruction on his theory of the case if there is evidence to support the instruction and it is in accordance with the applicable law. *Lhotka v. Larson,* 307 Minn. 121, 125, note 7, 238 N.W.2d 870, 874 (1976); *Manion v. Tweedy,* 257 Minn. 59, 63, 100 N.W.2d 124, 127 (1959).

■ Plaintiff asserts that since Dr. Tongen admitted that he had never treated a case of hepatitis, he should have known from the test results (which arguably indicated hepatitis) that Mrs. Cornfeldt's condition was beyond his capacity to treat and that consultation with a liver specialist was necessary.[10] This argument is misconceived. Although Dr. Tongen may never have treated a case of hepatitis, there was no showing that it was beyond his skill to operate on a person recognized to have hepatitis. Plaintiff's argument is thus reduced to the proposition that a specialist should have been consulted in order to interpret the test results since Dr. Tongen incorrectly did so. But no evidence demonstrated that a surgeon acting competently could not in-

9. Dr. Knutson had never had a patient suffer liver failure as a result of administration of Fluothane in some 20,000 operations, including successive uses of the anesthetic within 30 and 60 days. It was his opinion that Fluothane could be used successively in a 30-day period. He also was aware of the results of the National Halothane Study, which found Fluothane to be a comparatively safe anesthetic.

10. Plaintiff also argues that opinion testimony demonstrated that accepted medical practice required the surgeon and anesthesiologist to consult with each other about the abnormal test results. Because both Dr. Tongen and Dr. Knutson saw the test results and independently arrived at the same conclusion, if their failure to consult with one another was a deviation from accepted medical practice, that failure bears no causal relationship to Mrs. Cornfeldt's injury.

terpret the results; indeed, the evidence was to the contrary. Hence the argument is not grounded on a failure to consult, but instead on a failure to apply the knowledge possessed by surgeons in good standing in interpreting the test results, i. e., whether it was accepted surgical practice to proceed with the operation in light of the abnormal results. In these circumstances, a duty of consultation does not arise. *Manion v. Tweedy,* 257 Minn. 59, 65, 100 N.W.2d 124, 128 (1959).

5. Plaintiff also requested an instruction on the duty of Dr. Tongen and Dr. Knutson to secure Mrs. Cornfeldt's informed consent to the operation. The trial court denied plaintiff's request on the basis of the record as a whole, specifically citing the consent form signed by Mrs. Cornfeldt and the conversations she had with Dr. Tongen and Dr. Knutson. Plaintiff asserts, however, that the pertinent duty of disclosure arose with the discovery of the abnormal test results before surgery. Neither Dr. Tongen nor Dr. Knustson discussed these results with Mrs. Cornfeldt or her husband.

 Plaintiff's theory sounds in negligence and not battery and thus presents a cause of action not yet recognized in Minnesota. We have found doctors liable in battery for failure to secure the consent of a patient. See, *Mohr v. Williams,* 95 Minn. 261, 104 N.W. 12 (1905), overruled on other grounds; *Bang v. Charles T. Miller Hospital,* 251 Minn. 427, 88 N.W.2d 186 (1958); *Genzel v. Halvorson,* 248 Minn. 527, 80 N.W.2d 854 (1957). An action for *battery* is appropriate where the treatment consists of a touching that is of a substantially different nature and character from that to which the patient consented. In *Mohr,* for example, a physician was held liable for operating on a patient's left ear after obtaining consent to operate on her right ear. When the patient substantially understands the nature and character of the touching, an action for *negligent nondisclosure* will lie if the patient was not properly informed of a risk inhering in the treatment, the undisclosed risk materialized in harm, and

consent to the treatment would not have been secured if the risk were disclosed. Today we recognize a cause of action for negligent nondisclosure of risks attendant to proposed or alternative methods of treatment.

 A physician cannot disclose a risk of treatment if he is unaware of it. Thus, the duty to inform the patient presupposes another duty—namely, that a physician possess the knowledge of a reasonably well-trained and knowledgeable physician practicing under the circumstances. Waltz & Scheuneman, *Informed Consent to Therapy,* 64 N.W.U.L.Rev. 628, 631 (1970). Clearly, if the physician did not know of the risk and had no duty to know of it, he cannot be held liable for failure to inform the patient. But neither can a physician's culpable ignorance shield him from liability. If a physician should have known of a risk that should have been disclosed to the patient, he may be liable for negligent nondisclosure. A duty of disclosure can arise, however, only if the physician knew or should have known of the risk to be disclosed.

 Neither Dr. Tongen nor Dr. Knutson admitted to knowledge that the preoperative test results reflected liver disease which would materially increase the risk of the gastrectomy. Plaintiff, however, introduced expert testimony indicating that under accepted medical practice a surgeon or anesthesiologist would have been aware of the increased risk the test results arguably foretold. It was a question for the jury whether Dr. Tongen or Dr. Knutson should have had knowledge of the increased risk.[11] If the doctors had a duty to know, the question of a duty to disclose is raised.

A majority of the jurisdictions that recognize a cause of action for negligent nondisclosure employs accepted medical practice in the circumstances as the standard of disclosure and requires expert testimony to establish that standard. Comment, 54 Neb. L.Rev. 66, 71; Annotation, 52 A.L.R.3d 1084. See, e. g., *Bly v. Rhoads,* 216 Va. 645, 222 S.E.2d 783 (1976). A growing number

---

11. It is proper to submit the issue to the jury as a separate interrogatory in a special verdict.

of courts,[12] however, have adopted an objective test of informed consent, i. e., risks of a treatment or the existence of an alternative treatment must be disclosed to the patient if a reasonable person in what the physician knows or should have known to be the patient's position would likely attach significance to that risk or alternative in formulating his decision to consent to treatment.[13] The objective test emphasizes patient self-determination instead of the professional competence of the physician. Both tests are invoked by evidence introduced by plaintiff.

Defendants advance two arguments which would make adoption of a standard of disclosure unnecessary in this case. They argue first that nondisclosure was justified because knowledge of the results of the preoperative tests would have increased Mrs. Cornfeldt's apprehension. Dr. Tongen testified that Mrs. Cornfeldt was emotionally upset before surgery and described his decision to proceed in spite of the abnormal test results as follows:

" * * * The other course of action would be to defer the surgery for two or three days; obtain more tests; increase the apprehension of this lady a good deal * * *. I could not conceive of a situation, or a test that would—that we would obtain in the presence of such an excellent clinical state that would cause us to abandon efforts to cure her cancer of the stomach. And in considering the trauma and the risk, and the increased apprehension that one would inflict upon the patient in that situation, and that the fact that after such tests were obtained, we would still advise the same course of action, namely proceeding with the operation and incurring the risks and hazards

of that decision in an effort to cure cancer of the stomach. And in that evaluation, as one does in every operation that a surgeon does, you weigh the risks of the disease and you are obliged to use your best judgment to choose the lesser risk and the greatest benefit.

"It was my judgment that in fulfilling my obligations to Mrs. Cornfeldt, as her doctor, that we would be taking the fewest risks with the least trauma and the greatest benefit in proceeding with the operation."

It is evident from this testimony that Dr. Tongen did not feel that disclosure of the test results would be medically damaging to Mrs. Cornfeldt but only that he did not want to concern her with what he regarded as a foregone conclusion.

The therapeutic privilege, a well-recognized exception to the objective standard of disclosure, excuses the withholding of information where disclosure would be unhealthful to the patient. The privilege is applicable only if disclosure of the information would complicate or hinder treatment, cause such emotional distress as to preclude a rational decision, or cause psychological harm to the patient. *Canterbury v. Spence,* 150 U.S.App.D.C. 263, 280, 464 F.2d 772, 789, certiorari denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972). From Dr. Tongen's testimony it is apparent that the privilege is inapplicable here. See, Waltz & Scheuneman, *Informed Consent to Therapy,* 64 N.W.U.L.Rev. 628, 641. Moreover, since no testimony demonstrated that nondisclosure was justified under accepted medical practice to preserve Mrs. Cornfeldt's health, defendants' argument also

**12.** *Canterbury v. Spence,* 150 U.S.App.D.C. 263, 464 F.2d 772, certiorari denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), is the leading case. See, *Scaria v. St. Paul Fire & Marine Ins. Co.,* 68 Wis.2d 1, 227 N.W.2d 647 (1975); *Wilkinson v. Vesey,* 110 R.I. 606, 295 A.2d 676 (1972); *Small v. Gifford Memorial Hospital,* 133 Vt. 552, 349 A.2d 703 (1975); *Cooper v. Roberts,* 220 Pa.Super. 260, 286 A.2d 647 (1971); *Miller v. Kennedy,* 11 Wash.App. 272, 522 P.2d 852 (1974), affirmed, 85 Wash.2d 151, 530 P.2d 334 (1975); *Sard v. Hardy,* 34

Md.App. 217, 367 A.2d 525 (1976), certiorari granted (1977); *Congrove v. Holms,* 37 Ohio Misc. 95, 66 Ohio O.2d 295, 308 N.E.2d 765 (1973). See, also *Woods v. Brumlop,* 71 N.M. 221, 377 P.2d 520 (1962).

**13.** Exceptions that excuse nondisclosure exist for emergency situations, risks commonly known, and the like. See, e. g., *Cobbs v. Grant,* 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972).

fails with respect to that disclosure standard.[14]

Defendants' other argument is that plaintiff failed to demonstrate a causal relationship between their failure to disclose and Mrs. Cornfeldt's consent. The causal element in an informed consent case requires that the plaintiff prove that disclosure of the significant risks incident to treatment would have caused a refusal to consent to that treatment. A majority of jurisdictions employs a subjective test of causation, i. e., the plaintiff must introduce evidence demonstrating that, had the risk been disclosed, he would have withheld consent. Comment, 54 Neb.L.Rev. 66, 91 (1975). E. g., *Poulin v. Zartman,* 542 P.2d 251, 275 (Alaska 1975); *Shetter v. Rochelle,* 2 Ariz.App. 358, 367, 409 P.2d 74, 83 (1965); *Wilkinson v. Vesey,* 110 R.I. 606, 628, 295 A.2d 676, 690 (1972). Plaintiff failed to introduce evidence that Mrs. Cornfeldt would not have consented to surgery had she been informed of the test results and their significance. Therefore, in most jurisdictions plaintiff would not be entitled to an instruction on informed consent.

Again, however, a number of courts[15] have taken a different approach and adopted an objective test of proximate cause: Whether a reasonable person in the plaintiff's position would have refused the treatment had he been informed of the undisclosed risk. The objective test is the preferable measure of probable cause. It is probably the test a jury applies in evaluating the credibility of a patient's testimony under the subjective standard. Moreover, if the patient is unable to testify, as in this case, reconstruction of his hypothesized state of mind seems a harsh evidentiary requirement. But if the patient is available

to testify, the subjective test exposes the physician to the patient's perhaps bitter evaluation in light of the unsuccessful treatment of what he would have decided. *Canterbury v. Spence,* 150 U.S.App.D.C. 263, 281, 464 F.2d 772, 790, certiorari denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972). Defendants argue that even under the objective test plaintiff's case is insufficient. They assert that no reasonable patient in Mrs. Cornfeldt's position would have postponed the operation to await the results of further tests, since the gastrectomy should have been performed as soon as practicable to minimize the spread of the cancer. We cannot agree as a matter of law; the issue of proximate cause was a question for the jury. Defendant's second argument therefore fails.

We are thus confronted with the selection of a standard of disclosure. Plaintiff's argument on the comparative worth of the different disclosure standards has been less than plenary. This difficult issue has been buried among the many others presented for our consideration. Therefore, we hesitate to delineate a definitive standard, but instead advance propositions whose refinement must await a later case.

A standard of disclosure gauges whether a physician is negligent in failing to disclose a risk of treatment. Thus, it is logical to employ the usual standard for medical negligence to nondisclosure of risks. But a standard of accepted medical practice may not effectively implement the motivation behind recognizing the doctrine of informed consent. Our society is morally and legally committed to the principle of self-determination, a corollary of which is the right of every adult of sound mind to determine what shall be done with his own body. Cf.

---

**14.** In a situation in which nondisclosure is warranted, the physician should seek consent from a close relative. *Canterbury v. Spence,* 150 U.S.App.D.C. 263, 280, 464 F.2d 772, 789, certiorari denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972); 2 Louisell & Williams, Medical Malpractice, § 22.02.

**15.** *Canterbury v. Spence, supra;* *Bowers v. Garfield,* 382 F.Supp. 503 (E.D.Pa.) (applying Pennsylvania law), affirmed, 503 F.2d 1398 (3

Cir. 1974); *Cobbs v. Grant,* 8 Cal.3d 229, 245, 104 Cal.Rptr. 505, 515, 502 P.2d 1, 11 (1972); *Funke v. Fieldman,* 212 Kan. 524, 512 P.2d 539 (1972); *Fogal v. Genesee Hospital,* 41 App. Div.2d 468, 474, 344 N.Y.S.2d 552, 560 (1973); *Scaria v. St. Paul Fire & Marine Ins. Co.,* 68 Wis.2d 1, 15, 227 N.W.2d 647, 654 (1975); cf. *Cunningham v. Charles Pfizer & Co., Inc.,* 532 P.2d 1377, 1382 (Okl.1974).

*Schloendorff v. Society of New York Hospital,* 211 N.Y. 125, 105 N.E. 92 (1914). Patient self-determination is meaningful only if the patient has received sufficient information so that he can knowingly and intelligently assess the risks and benefits of treatment before giving or withholding consent. Our aim is to make a rational decision by the patient possible without imposing unreasonable requirements on the physician.

 The best accommodation of professional competence and patient self-determination appears to be utilization of both the medical and a modified objective standard of disclosure. Failure to disclose a risk that would have been disclosed under accepted medical practice thus should be a sufficient, but not a necessary, condition of liability. No reason appears to justify withholding information from a patient, in light of his right to self-determination, if medical practice dictates disclosure. But even if his disclosure conforms to accepted medical practice, a physician nevertheless should be liable if he fails to inform the patient of a significant risk of treatment or of an alternative treatment. Of the decisions we have examined, the position of the California Supreme Court best expresses these sentiments:

"* * * [W]hen a given procedure inherently involves a known risk of death or serious bodily harm, a medical doctor has a duty to disclose to his patient the potential of death or serious harm, and to explain in lay terms the complications that might possibly occur. Beyond the foregoing minimal disclosure, a doctor must also reveal to his patient such additional information as a skilled practitioner of good standing would provide under similar circumstances." *Cobbs v. Grant,* 8 Cal.3d 229, 244, 104 Cal.Rptr. 505, 515, 502 P.2d 1, 11 (1972).

Expert medical testimony is necessary to establish accepted medical practice and identify the risks of treatment, their gravity, and likelihood of occurrence.

 Plaintiff introduced expert testimony that it was a deviation from accepted medical practice for Dr. Knutson to fail to inform Mrs. Cornfeldt of the increased risk, indicated by the abnormal test results, of the operation. No such evidence was introduced against Dr. Tongen. As to him, plaintiff argues that the abnormal test results indicated liver disease, and since surgery in the presence of liver disease may be of considerable risk to the patient's life and health, those results reflected a significant risk that Dr. Tongen should have disclosed to Mrs. Cornfeldt. We agree and find that plaintiff's evidence presented a jury question on the duty of both Dr. Tongen and Dr. Knutson to disclose to Mrs. Cornfeldt the significance of the abnormal test results. It was therefore reversible error to refuse to instruct on informed consent.

██ 6. At the close of plaintiff's evidence the trial judge granted the motion of defendant Knutson to remove the University of Minnesota Hospitals record of Mrs. Cornfeldt from the jury's consideration. The hospital records described her condition as halothane hepatitis. We agree with the trial judge that this diagnosis was inadmissible as part of the hospital records.

Although the diagnosis was not a "self-serving statement," *Boutang v. Twin City Motor Bus Co.,* 248 Minn. 240, 247, 80 N.W.2d 30, 37 (1956), and thus would otherwise be admissible as a hospital record, *Lindstrom v. Yellow Taxi Co.,* 298 Minn. 224, 232, 214 N.W.2d 672, 678 (1974), a difficulty arises because it is an unusual opinion of a nontestifying expert. See, McCormick, Evidence (2 ed.) § 313, p. 732. A controversy existed in the medical profession as to whether halothane could cause or intensify hepatitis. Indeed, plaintiff's expert admitted there was no scientific proof that halothane causes hepatitis. Since the diagnosis of halothane hepatitis was a "conclusion on the highly controversial ultimate issue," the trial court acted properly in requiring the author of the opinion to testify before the opinion would be admitted. *Skogen v. Dow Chemical Co.,* 375 F.2d 692, 704 (8 Cir. 1967).

██ 7. The trial court permitted to be received into evidence over plaintiff's objec-

tion a "stuffer sheet" issued by Ayerst Laboratories in 1975. The significance of the new "stuffer sheet" was that the United States Food and Drug Administration authorized Ayerst to remove the following caution from its earlier "stuffer sheet" in use at the time of Mrs. Cornfeldt's operation:

> "Cirrhosis or other abnormalities involving liver dysfunction, including a history of viral hepatitis, may be a basis for selecting an anesthetic other than a halogenated agent."

The trial judge overruled plaintiff's objections that the 1975 "stuffer sheet" was irrelevant. During cross-examination of Dr. Wier, defendant's counsel asked if the caution had been removed and received an affirmative reply.

Plaintiff argues that the "stuffer sheet" is hearsay, and that alternatively, its use to impeach Dr. Wier's testimony was improper under *Briggs v. Chicago Great Western Ry. Co.,* 238 Minn. 472, 57 N.W.2d 572 (1953). Defendant Knutson's reply is based on *Mulder v. Parke Davis & Co.,* 288 Minn. 332, 181 N.W.2d 882. The *Mulder* case established that a deviation from a manufacturer's recommendations as to the use of medication is prima facie evidence of negligence, and the burden is on the doctor to advance reasons for the deviation. Defendant asserts that the subsequent deletion of the warning from the "stuffer sheet" is a most significant explanation. But because the "stuffer sheet" was revised nearly 2 years after the operation in question, it is an explanation only insofar as it is substantive evidence, and to that extent it is hearsay

and inadmissible. *Briggs v. Chicago Great Western Ry. Co.,* 238 Minn. 472, 491, 57 N.W.2d 572, 582 (1953); *Ruud v. Hendrickson,* 176 Minn. 138, 222 N.W. 904 (1929). Yet as impeachment evidence the "stuffer sheet" meets the standards of *Briggs.* The *Briggs* case authorized the use of medical works for impeachment if the witness bases his opinion on the work or recognizes it as a standard authority. It must be presumed that the medical profession recognizes the United States Food and Drug Administration as a standard authority with respect to its regulation of warnings that accompany medication. Our holding in *Mulder v. Parke Davis & Co. supra,* implies as much. Cf. Rule 803(18), Federal Rules of Evidence (reliability of medical authority may be established by judicial notice). Thus, citing removal of the caution for impeachment purposes was proper and no reversible error appears.

■ 8. The trial court excluded from evidence on the grounds of materiality and relevancy a publication of the Joint Commission on Accreditation of Hospitals entitled "Accreditation Manual for Hospitals— 1970," which was in force at Miller Hospital at the time of Mrs. Cornfeldt's operation. The rationale for the court's ruling was that the manual was immaterial to the applicable standard of care, Dr. Tongen and Dr. Beals both testified that they had no familiarity with the manual. Plaintiff attempted to introduce the manual into evidence because it set forth standards to be followed by the hospital in supplying anesthesia care.[16]

---

16. Standard IV provides: "Practices employed in the delivery of anesthesia care shall be consistent with the policies of the medical staff.

"Interpretation

"Because individuals with varying backgrounds may properly administer anesthetic agents, the medical staff must approve policies relative to anesthesia procedures, including the delineation of pre- and post-anesthetic responsibilities. Written policies of the medical staff relative to anesthesia care would include provision for at least:

"The preanesthesia evaluation of the patient by a physician, with appropriate documentation of pertinent information relative to the

choice of anesthesia and the surgical or obstetrical procedure anticipated. This evaluation should include the patient's previous drug history, other anesthetic experiences and any potential anesthetic problems.

"The review of the patient's condition immediately prior to induction of anesthesia. This should include a review of the chart, with regard to completeness, pertinent laboratory data, time of administration and the dosage of preanesthesia medications, together with an appraisal of any changes in the patient's condition, as compared with that noted on previous visits."

Plaintiff argues that the standards announced in the manual are evidence of accepted medical practice and therefore material and relevant. We agree. In *Boland v. Garber*, Minn., 257 N.W.2d 384 (1977), we held that a hospital regulation requiring the presence of an assistant physician during major surgery was material and relevant to the surgeon's duty of care. The *Boland* decision is dispositive of the materiality of the accreditation manual. The only apparent reason for finding it irrelevant is that it evinces a national standard of care and thus is not probative of accepted medical practice in this or a similar locality. This objection is unpersuasive because the manual was adopted by Miller Hospital, the standards are minimal in nature,[17] and it was offered against a specialist whose medical practice is gauged by a national standard. *Christy v. Saliterman*, 288 Minn. 144, 165, 179 N.W.2d 288, 302 (1970).

Although trial courts have discretion in making evidentiary rulings, it was clear error to exclude the accreditation manual. The standard it advanced was sufficiently specific to aid the jury in the determination of a standard of care. Moreover, its adoption by Miller Hospital is sufficient authentication that its standards are applicable to Dr. Knutson's conduct. But since Dr. Wier testified to the same effect and in more specific terms, the manual's probative value was cumulative and its exclusion, though error, does not require reversal. See, *Mutual Serv. Cas. Ins. Co. v. Overholser*, 239 Minn. 243, 247, 58 N.W.2d 268, 270 (1953).

■ 9. The trial court held as a matter of law that the pecuniary loss caused by Mrs. Cornfeldt's death could be measured by no more than a 40-hour week. This ruling was error and mandates a new trial on the issue of damages.

Mrs. Cornfeldt was a wife and mother; her husband and three daughters as next of kin sought recovery for her death. Testimony demonstrated the services she provided to her family and the approximate hours per week those services consumed. A state employment interviewer testified that a full-time and a part-time person working a total of 67 hours per week would have to be employed to render similar services to Mr. Cornfeldt and his daughters. No evidence supported the 40-hour figure prescribed by the trial court, and selection of that figure invaded the province of the jury under Minn.St. 573.02 to determine a fair and just recovery in reference to the pecuniary loss arising from Mrs. Cornfeldt's death. Defendants will have the opportunity on retrial to rebut plaintiff's evidence that the Cornfeldts had become accustomed to and require in the present circumstances a level of housekeeping rendered by employing someone 67 hours a week.

■ 10. We have already found that the district court properly granted the motion of Ayerst Laboratories for a directed verdict. Plaintiff also contests the directed verdicts granted to defendants Dr. Beals and United Hospitals, Miller Division. He argues first that the testimony of Dr. Burke that Dr. Beals should have read and interpreted the preoperative test results was sufficient to raise a jury issue as to the liability of the surgical resident. This contention must fail, as we discussed earlier, for lack of proximate causation. Second, plaintiff argues that Dr. Beals' failure to record on her chart Mrs. Cornfeldt's statement that her urine was as dark as beer raised a jury issue as to his negligence.

Dr. Beals generally recalled such a conversation with Mrs. Cornfeldt and it is evident that no notation of her statement appears on her hospital record. Upon her admission to the hospital a urinalysis had been made, however, and its results, available the morning of the operation, reported that Mrs. Cornfeldt's urine was clear and yellow, the normal appearance of urine. The trial court determined that, in view of the urinalysis report, the contrary testimony was insufficient to present the issue of Dr. Beals' negligence to the jury. Plaintiff argues that dark urine indicates liver dysfunction and if Mrs. Cornfeldt's statement

---

17. See, footnote 16, *supra*.

had been recorded on her hospital chart by Dr. Beals, Dr. Tongen may very well have delayed surgery.

A directed verdict is appropriate only when the evidence, taken in the light most favorable to the opponent of the motion, would mandate that the trial court set aside a contrary verdict as being against the weight of the evidence. Rule 50.01, Rules of Civil Procedure; *E. H. Renner & Sons, Inc. v. Primus,* 295 Minn. 240, 203 N.W.2d 832 (1973). The weakness in plaintiff's argument, assuming that Mrs. Cornfeldt's statement should have been recorded, is the assertion that Dr. Tongen might well have postponed surgery had he known of her remark. There was no evidence to support this assertion of proximate cause. Dr. Tongen testified that he thought urine normally was as dark as beer, as did plaintiff's expert, Dr. Wier. Moreover, in light of the urinalysis, Mrs. Cornfeldt's remark might reasonably have been attributed in part to her apprehension about the forthcoming surgery. Thus, it would only have been speculation to find that Dr. Tongen's decision would have changed, especially since he was aware of the possibility of liver dysfunction at the time and decided to proceed with the operation regardless. Therefore, it was not error to direct a verdict for defendant Dr. Beals and, because its only claimed liability was predicated on respondeat superior, for United Hospitals, Miller Division.

■ 11. Plaintiff urges that the trial court erred in granting defendants eight peremptory challenges, instead of the two normally allotted a party under Minn.St. 546.10, which provides:

"* * * Each party shall be entitled to two peremptory challenges * * *. The parties to the action shall be deemed two, all plaintiffs being one party, and all defendants being the other party, except, in case two or more defendants have adverse interests, the court, if satisfied that the due protection of their interests so requires, may allow the defendant or defendants on each side of the adverse interests not to exceed two peremptory challenges. * * * *"

Counsel for Dr. Beals and United Hospitals, Miller Division, submitted that they merited only one peremptory strike apiece; the court so held but granted each of the other three defendants two peremptory challenges.

In *Fick v. Wolfinger,* 293 Minn. 483, 198 N.W.2d 146 (1972), this court held that prejudice must be demonstrated in order to reverse for a new trial on the ground that an excessive number of peremptory challenges was granted. Plaintiff has demonstrated no prejudice and concedes as much in his brief. The issue is germane therefore only to the extent its resolution will guide retrial of this case.

Whether defendants Dr. Tongen and Dr. Knutson each merit two peremptory challenges depends on whether they have "adverse interests" necessitating "due protection" within the terms of the statute. In *Fick v. Wolfinger, supra,* a farmhand sued his employers and the owner of the rotary chopper which caused his injury. We found no cross issues between the defendants and stated: "It is true that each party wanted to escape liability and preferred that the other suffer rather than itself, but that alone does not mean that the parties had adverse interests." 293 Minn. 486, 198 N.W.2d 150. See, also, *Eilola v. Oliver Iron Min. Co.,* 201 Minn. 77, 275 N.W. 408 (1937); *Carr v. Davis,* 159 Minn. 485, 199 N.W. 237 (1924). No issue of contention appeared among the original defendants at trial, and we foresee no cross issues arising between Dr. Tongen and Dr. Knutson on retrial. Thus, as defendants, they are entitled to only two peremptory challenges.

We have examined the other issues raised by plaintiff and found them either mooted by our disposition of the issues discussed herein or without merit. For the reasons discussed above, we reverse and remand for a new trial with respect to the alleged negligence of Dr. Tongen in proceeding with the operation, the alleged failure of Dr. Tongen and Dr. Knutson to secure Mrs. Cornfeldt's informed consent to the operation, and plaintiff's damages. In other respects, we affirm the judgment.

Affirmed in part, reversed in part, and remanded.

OTIS, J., took no part in the consideration or decision of this case.